# W. R. WRIGHT et al., Appellants, v. BOARD OF EDUCATION OF ST. LOUIS.

### In Banc, December 6, 1922.

1. **SCHOOLS: Power of Board: Derived from Statute.** The power of a school board to make rules regulating the conduct of pupils, however remedial in their purpose and aside from their reasonableness, can be exercised only when comprehended within the words of the statute or necessarily implied therein. The express power may be general, or a specific grant, but in either case it must be inferable from the words defining it, and any doubt or ambiguity arising out of the terms of the grant must be resolved in favor of the people.

2. ——: ——: **General Statutory Power to Make Rules: Discretion: Rights of Pupils.** General statutory power of a public school board to make rules regulating the conduct of pupils will extend to whatever may be reasonably necessary to accomplish

Wright v. Board of Education.

the purpose it was intended to subserve, but it must be construed within the well established rules of construction, and it will not be so construed as- to authorize a rule that denies to pupils the rights and benefits the public school system affords without stint or distinction, and in considering the discretion of the board to make such rules the fact must also be considered that the system owes its existence and perpetuity to taxes drawn from the people, who, therefore, in a sense, have a proprietary interest in it.

*Held,* by DAVID E. BLAIR, J., dissenting, with whom ELDER, J., concurs, that such general statute empowers the board to make a reasonable rule, and the fact that the board has adopted a rule establishes prima-facie that it is reasonable, and the courts should not interfere with its enforcement unless it is oppressive and arbitrary; and if the conduct and activities of pupils, during or after school hours, tend to destroy the efficiency, order and discipline of the school, a rule prohibiting such conduct and imposing reasonable penalties for its violation is not oppressive, arbitrary or unreasonable.

4. ———: ———: ———: Regulating Conduct of Pupils Outside of School: Scholarship and Deportment. The unassailed deportment and scholarship of children of school age entitle them to admission as pupils to the public school of the district in which they reside, and being admitted they are entitled to enjoy all the rights and privileges accorded to others therein; and being admitted and their deportment and scholarship being unassailed, the school board has no authority to adopt and enforce a rule prohibiting them from participating in extra-curriculum activities outside of school hours and at their homes.

5. ———: ———: ———: ———: Greek Fraternities: Moral Rectitude. Under the statutes the School Board of St. Louis has no power to adopt and enforce a rule declaring high-school pupils who join or remain members of Greek-letter societies ineligible to membership in organizations authorized and fostered by the school or to participate in graduation exercises or to represent the school in any capacity whatever, the deportment and conduct of such pupils being unassailed, and the meetings of such societies, though characterized as "secret organizations," being outside of school hours, and nothing being shown to warrant a conclusion that membership of pupils in the societies has proved detrimental to the operation and control of the school.

*Held,* by DAVID E BLAIR, J., dissenting, with whom ELDER, J., concurs, that, conceding and asserting that a public school board has no power to control the conduct of pupils in their homes so long as their activities there do not interfere with the discipline and best interests of the school, the record

shows that the effect of the fraternities, which the rule seeks to suppress, upon their members and upon the general student body, is seriously demoralizing; that membership in them is built up by selections of the few, only those high school students being selected whom existing members personally like or may think their social equals or on the same plane because of opportunity or social status in the community; that the scholarship of their members was below that of other students; that the attitude of their members towards teachers and other students was arrogant and snobbish; that their members grouped themselves into undemocratic cliques and clans, which fostered undesirable distinctions in the student body based on wealth and social opportunities, and impeded the maintenance of legitimate organizations fostered by the school; that there was a great deal of complaint from children who were less fortunate and were not admitted to membership; that the record showing such to be the facts, and as the rule adopted by the board does not exclude from the high school members of the fraternities, but only seeks to deny them privileges which excellence in scholarship and deportment suggest, and to remove the hurtful influence upon the members and upon the school engendered by the fraternities by requiring pupils to cease their membership therein, and since said rule under the circumstances is neither unreasonable, arbitrary nor oppressive, the courts should yield to the discretion and judgment of the board, and not condemn the rule as an unwarranted attempt to regulate the conduct of children out of school hours or as an invasion of the rights of their parents.

6. ———: ———: ———: ———: ———: Reasonableness of Proscriptive Rule. In the absence of evidence that membership of high school pupils in Greek-letter societies, whose meetings are held outside of school hours, has proved detrimental to the operation and control of the school, the reason for a rule prohibiting them to join or remain members of such societies ceases to exist.

7. ———: ———: ———: ———: Detrimental Conduct. The board of a public school has no authority to adopt a rule attempting to control the conduct of pupils outside of school after they have reached their homes unless such conduct if permitted will clearly interfere detrimentally with the management and discipline of the school.

8. ———: ———: ———: Express Prohibition: Distinction. In determining the power of a public school board, under a general statute authorizing it to make rules for the government of the

school, to prohibit high school pupils from becoming members of Greek-letter fraternities, decisions based on an express statute forbidding the organization of such societies or membership therein furnish no guide. Nor do decisions based on statutes which give to school boards general charter powers not reviewable by the courts.

9. ———: ———: ———: **Exclusion: Discrimination.** Decisions which hold that a school board, whose powers to make rules for the government of the school are defined by a general statute, have no power to exclude from the school pupils who are members of a school fraternity, but does have power to make them ineligible to membership in any organization authorized and fostered by the school or to participate in its graduation exercises or to represent the school in any capacity whatever, are not founded on reason, but ignore the fact that public schools are public institutions, supported by public taxes, whose privileges the children of all citizens of the appropriate district may enjoy unless their conduct is such as to affect injuriously the school. To say that such a child may attend the school, but must forfeit certain privileges by reason of his membership in a prohibited fraternity, whose meetings are held out of school hours and of which he has become a member by consent of his parents, is to ignore the fundamental principles underlying the public school system. [DAVID E. BLAIR and ELDER, JJ., dissenting.]

Appeal from St. Louis City Circuit Court.—*Hon. William H. Killoren*, Judge.

REVERSED.

*Albert Chandler* and *William T. Rutherford* for appellants.

(1) By the common law control of children is parental. This has been trenched upon by statute, reducing parental authority by compulsory education and vaccination, by juvenile courts, by giving the mother equal rights with the father. The State can go still farther through the Legislature. At common law the father could "delegate part of his parental authority to the tutor or schoolmaster of his child," said Blackstone. And now by statute the school board has been given

certain powers.  So wherever the will of the parent and schoolmaster conflict the teacher must point to a statute.  Blackstone, Com. 452, 453; Dritt v. Snodgrass, 66 Mo. 286; State ex rel. Clark v. Osborne, 32 Mo. App. 536; Armstrong v. School District, 28 Mo. App. 180; Morrow v. Wood, 35 Wis. 59.  And compare Hobbs v. Germany, 94 Miss. 469, with Waugh v. Trustee, 237 U. S. 589.  And compare Ferriter v. Tyler, 48 Vt. 444, with Deskins v. Gose, 85 Mo. 485.  (2)  Our statutory history shows that the power of the St. Louis School Board has been from time to time, and steadily, reduced. Act Jan. 30, 1817, 1 Territorial Laws, p. 521; Act Feb. 13, 1833, 2 Territorial Laws, p. 399; Secs. 11135, 11457, R. S. 1919.  (3)  Legislatures are not presumed to enact laws as surplusage.  So every such grant, in the fourteen states mentioned in the agreed statement of facts as having adopted anti-fraternity laws, argues at least the legislative belief that the power was wanting or doubtful under the general charter, and the express grant was to supply this want.  The Missouri Legislature refused the defendant's request to pass such an act.  An anti-fraternity rule must be predicated on charter power.  State ex rel. v. Stallard v. White, 82 Ind. 278; Waugh v. Trustees, 237 U. S. 589; Wayland v. Hughes, 43 Wash. 441; Wilson v. Board of Education, 233 Ill. 471; Bradford v. Board of Education, 18 Cal. App. 19; State v. North, 27 Mo. 480.  (4)  The Missouri Legislature has refused to make these fraternities unlawful.  "The right of the people peaceably to assemble for lawful purposes existed long before the adoption of the Constitution of the United States.  In fact, it is and always has been one of the attributes of citizenship under a free government.  It 'derives its source,' to use the language of Chief Justice MARSHALL, in Gibbons v. Ogden, 9 Wheat 211, 'from those laws whose authority is acknowledged by civilized man throughout the world.'  It is found wherever civilization exists.  It was not, therefore, a right granted to the

people by the Constitution. The Government of ·the United States, when established, found it in existence, with the obligation on the part of the States to afford it protection.'' United States v. Cruikshank, 92 U. S. 442, 23 L. Ed. 591; Mo. Constitution, art. 2, sec. 29; Mo. Constitution, art. 11, sec. 1.

*Robert Burkham* for respondent.

(1) The Board of Education of St. Louis has power to make rules and regulations. Sec. 1, Art. XI, Mo. Constitution; Sec. 11457, R. S. 1919. (2) In the first instance the board of education is the judge of the reasonableness and the needfulness of its rules. State ex rel. v. Cole, 220 Mo. 697; In re Rabenack, 62 Mo. App. 8; Duffield v. School District, 162 Pa. St. 483. (3) The rule barring pupils who are fraternity members from engaging in extra-curriculum activities does not violate any legal right of appellants' child, for he has no legal right to engage in· such activities. (4) School authorities have the right to adopt rules relating to the conduct of pupils after school hours if such conduct has a direct and immediate effect upon discipline within the school. 35 Cyc. 1136; King v. School Board, 71 Mo. 628; Deskins v. Gose, 85 Mo. 485; Burdick v. Babcock, 31 Iowa, 562; Lauder v. Seaver, 32 Vt. 114; Sherman v. Inhabitants of Charlestown, 8 Cush. (Mass.) 160; State ex rel. Dresser v. School Dist., 135 Wis. 619, 16 L. R. A. (N. S.) 730; Kinzer v. School Dist., 129 Iowa, 441, 2 L. R. A. (N. S.) 985. (5) The board of education may lawfully forbid fraternity members engaging in extra-curriculum activities. Wayland v. Board of Education of Seattle, 43 Wash. 441, 7 L. R. A. (N. S.) 352; Wilson v. Board of Education of·Chicago, 233 Ill. 464, 15 L. R. A. (N. S.) 1136.

WALKER, J.—This is an action brought by certain tax-paying citizens of the city of St.·Louis, who are residents of a district tributary to and who have children

attending one of its high schools, who pursue regular studies therein for the purpose of completing the course and graduating therefrom. The purpose of the action is to enjoin the Board of Education of said city from enforcing a rule adopted by it declaring that pupils who become and remain members of a high-school fraternity are rendered ineligible to membership in any organization authorized and fostered by the school and are not entitled to represent it in any manner or participate in any of its graduating exercises. Upon a hearing before the Circuit Court of the City of St. Louis, plaintiffs' petition was dismissed and the board, as a consequence, was held authorized to adopt and enforce the rule in question. From this judgment, the plaintiffs have appealed.

The Board of Education is an elective body, the number and terms of its members being prescribed by the statute of its creation. [Art. 16, chap. 102, R. S. 1919.] The board is authorized to appoint a Superintendent of Instruction. This official is clothed with power, among other things, to "have general supervision, subject to the control of the board, of the course of instruction, discipline and conduct of the schools" etc. [Sec. 11461, R. S. 1919.]

The Superintendent, in January, 1920, made the following recommendation to the board:

"Secret organizations in the high schools are undemocratic and undesirable and injurious to the free and wholesome life of these schools. They exert a pernicious influence upon their own members and upon pupils who do not belong to them, and upon the voluntary organizations of pupils, that are approved and fostered by the schools, and they are subversive of the fundamental principles upon which the public schools rest.

"It is therefore recommended that the Board of Education declare itself as opposed to their existence in the schools and forbid the pupils of the high schools

to form or join such organizations or to contine to be members of them if they have already joined.''

. This was adopted as defining the regulatory action to be exercised by the board; and in December, 1920, a supplementary recommendation of the superintendent prescribing a penalty for a violation of the foregoing was adopted by the board as follows: ''It is, therefore, recommended that high school pupils who refuse to conform to this regulation be declared ineligible to membership in organizations authorized and fostered by the school; that they be not permitted to represent the school in any capacity whatsoever; and that they be not allowed to participate in graduation exercises.''

That portion of the statute (Sec. 11457, R. S. 1919) defining the power of the board and under which it assumes to act in this case, is as follows:

''Every. such board of education . . . shall have power to . . . make, amend and repeal rules and by-laws . . . for the government, . regulation and management of the public schools and school property in such city, . . . which rules and by-laws shall be binding on such board of education and all parties dealing with it until formally repealed. . . .''

I. The determination of the limit within which the power thus conferred may be exercised is the matter at issue. The influence public education exercises in the maintenance of good order and the consequent perpetuity of free government, is acknowledged by every impartial mind. The higher the intelligence of the people, the better the citizenship. Recognizing this truth, one of the greatest men the world has produced, upon retiring from public life, left this parting injunction in his farewell address to his countrymen: ''Promote then, as an object of primary importance, institutions for the general diffusion of knowledge. In proportion as the structure of government gives force to public opinion, it is essential·that public opinion should be enlightened.''

**Powers**
**Statutory.**

This was addressed to the people of the national government as then constituted. Congress, prompted probably to an extent by this sage suggestion, early began and has laudably continued to legislate liberally in the encouragement and support of public education. Helpful as this has been in the diffusion of knowledge with its consequent beneficial effects, it is after all upon the several states in their sovereign capacities, which should never be lessened, that the burden of promoting general intelligence rests. This State has not been loath to recognize the importance of this fact and in each of its constitutions has given it affirmative approval. The present constitution providing that. "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the General Assembly shall establish and maintain free public schools for the gratuitous instruction of all persons in this State between the ages of six and twenty years." [Sec. 1, Art. XI, Mo. Constitution.] Moved by the spirit which prompted the people to incorporate this provision in the Constitution, the Legislature has, from time to time, enacted salutary laws for the conduct and government of educational institutions, and has made ample appropriations for their maintenance. Legislation of this character being remedial in the highest sense, such a construction should be given to it as will best subserve the purpose intended, provided well established rules of construction are observed and the rights of citizens, whether inherent or statutory, are not violated. In view of the beneficent purpose of public education, it was not attempted in the Constitution (Art. XI) to place any restriction upon legislative action in regard thereto other than an age limit within which the rights granted were to be enjoyed. It is therefore within the purview of legislative power to enact any laws not in violation of individual rights, defining the power and duty of boards of education and enacting such laws as the General-Assembly may deem proper for the control and management of the schools.

The Legislature, however, in its wisdom, contrary to the course pursued in some other jurisdictions, has deemed it proper to prescribe only in the most general terms the powers to be exercised by such boards, and the regulations for the control of the schools and those attending same.

The manner in which this power has been defined is demonstrated in the statute (Sec. 11135, R. S. 1919) in regard to the power of boards of education of common schools, referred to here only by way of example, the more pertinent and concrete illustration of legislative action being found in the statute (Sec. 11457, supra) having reference to boards and schools of the character here under consideration. The reasons for this seeming legislative aloofness with its consequent avoidance of minutely defined powers of the boards and definitive regulations as to the conduct of the schools are not difficult of determination. A general statute lends itself more readily to construction than a special one. The purpose of the general statute having been ascertained, the exercise of the powers granted will extend to whatever may be reasonably deemed necessary to accomplish that purpose within the well-defined limitations heretofore mentioned. This latitude could not well be exercised under a special statute. In addition, a general statute affords more opportunity for such an interpretation as will result in denying to no pupil any of the advantages to be derived from the system, unless there exists cogent reasons therefor.

What constitutes such reasons may, as a general rule, be left, on account of the general character of the statute, to the discretion of the board. [State ex rel. O'Bannon v. Cole, 220 Mo. 697; Duffield v. School Dist., 162 Pa. St. 483; 35 Cyc. 1135.] Aside from other considerations, which may properly regulate this discretion, is the fact that the public school system owes its existence and perpetuity to taxes drawn from the people; in a sense, therefore, the citizens may be said to have a proprietary interest in the system.

This is true not only in a pecuniary sense in that he contributes annually to its support, but on account of the advantages extended to his children, who, within the contemplation of the law, are entitled, without stint or distinction, to whatever rights and benefits the system affords.

The power of the board to make the rule in this case is to be considered prior to a determination of its reasonableness. The power delegated by the Legislature is purely derivative. Under a well-recognized canon of construction, such powers, however remedial in their purpose, can only be exercised as are clearly comprehended within the words of the statute or that may be derived therefrom by necessary implication, regard always being had for the object to be attained. Any doubt or ambiguity arising out of the terms of the grant must be resolved in favor of the people. [Watson Seminary v. County Ct. Pike Co., 149 Mo. l. c. 70, and cases, 45 L. R. A. 675; Armstrong v. School Dist., 28 Mo. App. 180; 25 R. C. L, p. 1091. sec. 306 and notes.]

This does not mean that the grant need contain a specification of each act authorized to be done, but that the words used be sufficiently comprehensive to include the proposed act. Express authority may be general as well as particular, and although not defined in words, it must be clearly inferable from the purpose of the act.

II. In construing the statute from which the board derives its power in accordance with the foregoing canon, it is of first importance to determine whether the grant authorized the adoption of the rule in question.

Reasonableness. Dependent upon the manner in which this has been determined, the reasonableness of the rule may become a proper subject for consideration. The purpose of the rule, broadly stated, is to prohibit pupils from participating in any extra-curriculum activities outside of school hours and at their homes which have not received the approval of the board. Speaking more within the terms of the rule, it

places the ban of discrimination upon pupils and their exclusion from graduation exercises and honors, who unite with and participate in the activities of "secret organizations," by which term, as the evidence discloses, certain Greek-letter societies are intended to be designated.

It has uniformly been held in this State in construing a general statute, such as is here under consideration, that the domain of the teacher—in this instance the board—ceases when the child reaches its home unless its act is such as to affect the conduct and discipline of the school. [Dritt v. Snodgrass, 66 Mo. 286; State ex rel. Clark v. Osborne, 24 Mo. App. 309, 32 Mo. App. 536.] The testimony introduced by the respondent, much of which was inadmissible under the rules of evidence, is to a great extent made up of conclusions drawn from comparisons made by teachers from an *ex parte* examination of records kept by themselves, an inspection of which, for the purpose of securing evidence in this case, was denied to others. From these records, covering but a semester, it is attempted by a system of percentages to sustain the conclusion that members of the fraternities here sought to be tabooed received lower grades than other students. No charge is attempted to be made of any action having a semblance of moral turpitude, nor are the records of any individuals designated, which would at least have given more credence to the evident implication that their membership in the proscribed orders accounted for their delinquencies. Neither the deportment nor the scholarship of any of the pupils sought to be brought under the ban of this rule is attempted to be assailed; these are cardinal essentials, ample in themselves, to enable a pupil to secure admission to any institution of learning. Having secured admission, he is entitled, in an institution supported by the State, to enjoy all of the rights and privileges accorded to others therein. That this rule does not apply, as was the case in Pratt v. Wheaton College, 40 Ill. 186, to pupils of a privately endowed institution or one main-

tained by others than the State, does not demand comment other than to note the distinction.

A careful review of this record does not impress us with the cogency of the proof offered by the respondent in support of this rule.

III.   There is nothing shown as to the conduct of the pupils alleged to be within the purview of the rule to support the conclusion that their membership in the societies designated has proved detrimental to the operation and control of the school.   In the absence of such evidence the reason for the rule, so far as this case is concerned, ceases to exist.

Conduct Outside of School.

Ancillary to this conclusion is the question as to the authority of the board generally in the adoption of rules of this character.   A fair test as to that limit is the one above defined, namely, that no rule should be adopted which attempts to control the conduct of pupils out of school hours after they have reached their homes which does not clearly seek to regulate actions, which, if permitted, will detrimentally interfere with the management and discipline of the school.   The rule as thus expressed clearly defines the line of demarcation between the respective domains of the parent and the teacher. Judicial sanction has been given to it in Dritt v. Snodgrass, 66 Mo. 286, 27 Am. Rep. 343, in which this court held that the directors of a school district had no right to enforce a rule authorizing the expulsion of a pupil for attending social parties after such pupil had returned to his home and his parents had approved his attending the party.

Another illustration of the approval of this conclusion is found in an opinion of the Kansas City Court of Appeals.   In that case the faculty of one of our State normal schools had adopted a rule suspending pupils who attended social gatherings out of school hours.   A pupil, after returning to her home and with her father's consent, attended a party.   It was held that a statute es-

pecially applicable to normal schools, authorizing the
faculty to suspend or expel a pupil for contumacy, in-
subordination or immoral conduct did not authorize the
adoption of a rule prohibiting a pupil from attending
a social party under the conditions here stated. [State
ex rel. Clark v. Osborne, 24 Mo. App. 309.]

In King v. Jefferson City School Board, 71 Mo. 628,
this court held that it would interfere to prevent the en-
forcement of a rule of a school board which manifestly
reached beyond its sphere of action and related to
subjects in no wise connected with the supervision or
successful operation of the school, or which was plainly
calculated to subvert or retard the leading object of
legislation on this subject. It was further held in this
case that a rule authorizing suspension for a certain
number of days for continued absence was not unrea-
sonable. This, however, does not affect the general rule
as first stated. A like ruling for a similar infraction
was made in Burdick v. Babcock, 31 Iowa, 562, in which
it was declared that such absences were detrimental to
the good order and best interests of the school. Upon
this alone the rule was upheld.

A rule adopted by the trustees and faculty of Pur-
due University, an Indiana State institution, rendering
membership in a Greek-letter fraternity a disqualifica-
tion for admission to the university as a student, was
declared unauthorized. The court said that since the
university was an institution primarily endowed by
Congress and continued in existence by appropriations
made by the General-Assembly, it was therefore an edu-
cational institution sustaining a relationship to the
people at large analogous to that occupied by other
schools and colleges maintained at public expense, and
one in which all inhabitants of the State had a common
interest; and that the rule refusing admission or exclud-
ing students because they were members of a Greek-let-
ter fraternity or other secret college society was unau-
thorized and invalid. [State ex rel. Stallard v. White,
82 Ind. 278, 42 Am. Rep. 496.]

IV. The foregoing cases, which apply more particularly to social rights, are to be distinguished from those in which rules have been sustained forbidding action clearly detrimental to the good order and best interests of the school, whether committed in school hours or while the pupil is on his way to or from school, or possibly after he has returned home; this last provision, however, must reasonably be held to apply to such personal overt acts as in themselves render the pupil objectionable as a member of the school. [Hobbs v. Germany, 94 Miss. l. c. 479; Dresser v. School Brd., 135 Wis. l. c. 627; Lander v. Seaver, 32 Vt. l. c. 120.] For example: A pupil may be punished for disrespectful language in regard to a teacher after he has returned home and is with another schoolmate passing the teacher's house. [Lander v. Seaver, supra.]

*Moral Turpitude.*

In recognition of the right of a board to enforce a disciplinary rule, our own Supreme Court has held that punishment may be inflicted for violation of a rule prohibiting the use of profane language, quarreling or fighting among pupils, although the violation occurred one-half or three-quarters of a mile from the schoolhouse, after the school had adjourned for the day and the pupils were on their way to their respective homes. [Deskins v. Gose, 85 Mo. 485, 55 Am. Rep. 387.] A Texas case, Hutton v. State, 23 Tex. App. 386, is of like effect.

An extreme case of this character is that of Kinzer v. Toms, 129 Iowa, 441, 3 L. R. A. (N. S.) 496, in which a rule of a school board forbidding pupils to play football under the auspices of the school was held not to be unreasonable or in excess of the authority of the board, although, applied to conduct on holidays and away from the school grounds. This case is an extreme illustration of the upholding of a disciplinary rule the violation of which involves no moral turpitude.

A rule to maintain the purity and discipline of the public schools authorizing the exclusion of pupils there-

from because of licentious and immoral conduct was
authorized, although the pupil accused was guilty of
no immoral conduct within the school. [Sherman v.
Charlestown, 8 Cush. (Mass.) 160.]

V.   Cases in which the rules promulgated were based
on express statutory authority forbidding the organi-
zation of or membership in a fraternal organization fur-
nish no guide for the determination of the matter at
issue.   Of this class is Waugh v. Trus-
Express Statutory    tees, 237 U. S. 589, 59 L. Ed. 1131, a Mas-
Prohibition.
sachusetts case in which the United
States Supreme Court upheld the power of the Legis-
lature of that State to enact a law prohibiting students
of its educational institutions from affiliating with fra-
ternal orders.   The ruling was simply to the effect that
the prohibition was a matter within the power and wis-
dom of the State legislature, and that its enforcement
did not offend the due process provision of the Four-
teenth Amendment.

The rule in Bradford v. Board of Education, 18
Cal. App. 19, was under an anti-fraternity statute of
that State and, hence, is not controlling here.

VI.   Another class of cases is where the boards are
given a general charter power not subject to review by
the courts.   The rulings of the supreme courts
General
Charter    of Washington and Illinois furnish illustrations
Power.    of cases of this character.

Wayland v. Board of School Directors, 43 Wash.
441, 7 L. R. A. (N. S.) 352, except as to the qualifying
nature of the charter, is in conflict with our ruling here-
in and with the current of authority elsewhere.   This
ruling is based upon a general statute, and upholds a
rule adopted by the board of school directors excluding
from the high schools of Seattle members of fraternities
organized against the will of the board, although such
memberships were with the consent of the parents of
the pupils and the meetings of the fraternities were held

295 Mo.—31

out of school hours. The penalty prescribed for an infraction of this rule was to debar such pupils from athletic games, musical and literary societies and to deprive them of customary honors. In short, the penalty prescribed in the rule under consideration seems to have been copied in all of its exclusiveness from that adopted by the Seattle board. Aside from whatever support the conclusion reached in that case may derive from the charter, the reasoning employed by the court is faulty and its conclusion unfounded. It speciously contends that the rule does not exclude the appellant from the Seattle high school; that he does and can attend school, but forfeits certain privileges by reason of his membership in the prohibited fraternity. This reasoning ignores the fact that the schools are public institutions, supported by the taxes of the people, to which the children of all of its citizens within the appropriate districts may enjoy the privileges of same unless their conduct is such as to injuriously affect the school. Those who are members of the prohibited fraternities, unless same are shown to possess the detrimental features stated, are as much entitled to all of the advantages afforded by the school as other pupils. To deny them this right constitutes an unjust discrimination unsupported by right or reason, which should not receive judicial sanction. The ruling, therefore, in so far as it may be regarded as affording a persuasive precedent for our action, will not be followed.

The case of Wilson v. Board of Education, 233 Ill. 464, 15 L. R. A. (N. S.) 1136, reaches the same conclusion as in the Wayland Case upon a somewhat similar state of facts. The criticism made and conclusion reached as to the ruling in the Wayland Case applies with like force to the Wilson Case.

The lack of power of the board to adopt the rule in question, having been demonstrated, a discussion of its discretion is rendered unnecessary. Either by reasonable implication or direct expression, the limits of that discretion may be readily determined from what

has heretofore been said. It will suffice, therefore, to say it should extend no further than may be found reasonably necessary to promote the intelligent conduct and control of the school, as such, within the domain we have defined. Any other interpretation would remove all limit to the exercise of discretionary power, leaving it to the judgment, whim or caprice of each succeeding board. We have not reached that point in the interpretation of a delegated power where, with a proper regard for the rights of citizens and the rules of construction, we feel authorized in holding, as was held in Wayland v. Board, supra, that the board's power is to be limited only by its discretion free from any determination by the courts.

From all of the foregoing it follows that the plaintiffs are entitled to the relief sought.

We therefore reverse and remand this cause, with directions to the circuit court to set aside its judgment and enter a decree herein perpetually enjoining the respondent from in any manner enforcing the rule in question. It is so ordered. *Woodson, C. J.*, and *Graves* and *Higbee, JJ.*, concur; *James T. Blair, J.*, concurs in result; *David E. Blair, J.*, dissents in separate opinion, in which *Elder, J.*, concurs.

DAVID E. BLAIR, J. (dissenting).—The sole question in this case is the power of the Board of Education to make and enforce a rule denying the benefit of extracurriculum activities to students who persist in defying the rule of the board, excluding secret societies from the high school itself, by affiliating with such societies and attending meetings thereof in their own homes or elsewhere out of school hours. The board is not attempting to interfere with such students in their regular school work or to suspend them or expel them from school. It is not contended that the rule results in their unfair treatment *as students*. They get the same character of instruction as other students, and upon completion of the course of study are furnished with a diploma certifying

to that fact.   But they are denied the privilege of participation in public graduation exercises and are not permitted to engage in such extra school activities as representing the school on the football team, baseball team, track team, debating team and similar organizations.

I would not admit for a moment that the board has power to go into the home and attempt to control in any way the conduct of the student therein, so long as such student engages in home activities which do not interfere with the discipline and best interests of the school.   No one would contend that the board does not have power, even in the absence of statute, to exclude entirely from the school premises any student who exposed himself to contagious disease out of school hours and threatened to carry the contagion into the midst of his fellow-students.   Such action of the board would commend itself to every right-thinking person as a reasonable exercise of its official power and duty.   I use the extreme illustration solely to make it clear that the power to prevent demoralization and injury to the school must necessarily exist in the board.

The majority opinion well states the rule ''that the domain of the teacher—in this instance the board—ceases when the child reaches its home, unless its act is such as to affect the conduct and discipline of the school.''   But the record shows that the acts of the students in joining and in remaining members of secret organizations do seriously and detrimentally affect the conduct and discipline of the school, as well as the scholarship and behavior of such members themselves.   In my judgment the rule made by the board comes clearly within the exception recognized in the majority opinion.

It is impossible to read the record in this case impartially and not come to the conclusion that the effect of fraternities and sororities in the high school upon their members and upon the general student body is seriously demoralizing.   I quote from the testimony of

Judge JESSE McDONALD, a former circuit judge and former president of the school board:

"It was during my term as president that we began the investigation in the board of the propriety of adopting a rule against fraternities. There was a substantial disinclination against it in my own mind at the beginning. The investigation went on, and I began inquiring personally of teachers, principals and assistant superintendents and the supervisors who come in contact with the influence of these organizations, and we became convinced of what our official duty was in that way, if I may be permitted to make that general statement. We had reports through the superintendent's office coming from the teachers and the supervisors who were in contact with the influence of these organizations, and on the strength of those reports as to the effect of the organizations in the schools, the vote was taken on the propriety of the rule, and you know the result of the vote.

"Well, there were committee meetings which I attended, some of the committee on instruction, and there was a great deal of talk among the individual members of the board about it, and discussions out of session as well as in session.

"There was a meeting, a conference of the board, called to give the opponents of the rule a hearing. That was long after the rule was adopted.

"There were two rules, the first in January, 1920, and the second was a confirmation of it annexing certain penalties, in November, 1920. But it was a matter of discussion among the members almost from the time I went into the board. . . .

"The board was influenced by the effect that the fraternities had on the scholarship of the members of the fraternity, to a very considerable extent. It was explained by somebody that that might not be a result of the fraternity, but an incident of the particular membership. But the membership in the fraternities was made up of children who had as great or better opportunities

in life than the average child in the high schools, and notwithstanding that opportunity, the scholarship of the membership of the fraternities was distinctly low. That was the most striking objection. The arrogant attitude of the members of the fraternity towards the teaching staff and towards the other scholars in the school was another substantial influence. The tendency to make snobs and cliques and clans out of the members of the fraternities, curbing the organization and the bad influence on the legitimate organizations of the school by the boys that were admitted to membership in the fraternity, the fact that they apparently had a continuing influence in breaking down that leveling spirit that is so desirable in an institution like a public school where every boy and girl ought to be on a social level, and where they are not on a social level, if a selected few of them belong to a secret organization and govern themselves accordingly as boys of that age will govern themselves when they do belong to that kind of a secret organization. There was a great deal of complaint from the children who were less fortunate, and who were not admitted to membership in the organizations. The organizations are built up by selection, and from the selection of the few, taking in only those who they may think are their social equals or who they may happen to like personally particularly well, too, mainly on a social or business opportunity basis. I mean by business, the families being on the same plane by opportunity for wealth, not their exact social status in the community. Those are some of the reasons why the board felt that the fraternity was an undemocratic and exceedingly undesirable organization to have maintained in a public school sustained by public taxation. It created a directly bad influence among the membership of them. Of course, we found reports coming in to the effect that here would be a fraternity that seemed to harbor none of those influences, but the influence of the matter as a whole was distinctly bad, and because there would be

one here and there as a rare exception made up of boys or girls who seemed to rise above that general tendency of the organization was not sufficient reason for not condemning it as a whole, because in the great mass of them, the influence was bad, and you couldn't get away from that influence and leave an opportunity to the few who might join such an organization and conduct themselves well and neither injure themselves nor be offensive and unfair and unreasonable to their associates in the school in their attitude towards them."

John R. Powell principal of the Soldan High School, where the secret society problem has been most acute, was most outspoken in his condemnation of such societies. He and others testified to facts tending to show most undesirable effects, not only upon the members of such societies, but upon the whole school. Respondents have summarized the evidence in their brief and I am convinced, from a careful reading of the record, that such summary is a fair one. I quote from the same as follows:

"*As to scholarship*: A critical and comparative study of the relative scholarship of fraternity and non-fraternity members in the Soldan High School was made by Mr. Powell. It covered the entire half-year period ending in June, 1920. For present purposes, we content ourselves with this bare statement of the ultimate results:

"One pupil in *four* of the entire schools (including the fraternity and the non-fraternity group) attained an honor grade. Whereas but one pupil in *ten* among the fraternity group attained an honor grade.

"But one pupil out of *eight* (*or ten*) of the entire school (including both the fraternity and the non-fraternity group) failed in two or more subjects. Whereas, one pupil out of *four* among the fraternity group so failed.

"A more striking demonstration of the evil influence of membership in these organizations upon work in the class room cannot be imagined!

"It is noted, too, that when a pupil joins a fraternity as a usual thing his scholarship records begin to fall off.

"The striking part of it all is that the fraternity members as a rule come from the homes of greatest wealth, culture and opportunity. As a class, they should lead in scholarship rather than the contrary.

"*As to discipline*: Here again we have very accurate figures. Without having a thought of its possible use in this connection, Mr. Holden, assistant principal of the Soldan High School, kept a record, covering a number of months, and beginning in September, 1920, of the names of every pupil sent to his office for disciplinary purposes. This list was made without any regard to fraternity membership. Upon checking up the list, which was done after this suit was begun, the following facts appeared:

"Forty-four per cent of the fraternity boys were disciplined for one cause or another, while but 11.4 per cent of the whole group of boys were thus disciplined.

"In other words, the conduct of the total boy membership in the Soldan High School was four times as satisfactory as that of the boys constituting the fraternity group."

The case against the existence of secret societies in the high school itself is overwhelmingly strong. Educational bodies have gone on record against them time and again. Other organizations have gone out of their way to register their disapproval. The general result is impairment of discipline and an increase of insubordination. The effect of their presence is to make non-fraternity students dissatisfied, and to weaken their purpose to secure a high school education and I have no doubt many instances might be shown, if the true facts were known, where the presence of such organizations have driven students entirely out of school who were utterly unable to attend school elsewhere, thus effectually denying them an education. It is intolerable that such

conditions should be sanctioned in a school *supported by taxation of the whole people.*

I do not understand that appellants are attacking the reasonableness of the rule excluding such societies from the school itself. Their position is that since students attend meetings and social functions of such societies under the supervision of their parents and at their homes or other places outside the school premises and out of school hours, the board has no power to penalize such students. And this is their contention, in the face of the overwhelming proof, that such societies and participation in their activities, even under such conditions, reach into and demoralize the very life of the school. I am unable to yield assent to the proposition.

Section 11457, Revised Statutes 1919, gives the Board of Education the power to make rules for the government, regulation and management of the public schools. This is not an unlimited power. Such rules must be reasonable, but the fact that the board has adopted a rule establishes prima-facie that it is reasonable. [State ex rel. v. Cole, 220 Mo. 697.] If the board has the power to promulgate a given rule, the courts will not interfere, unless such rule is oppressive or arbitrary. [In re Rebenack, 62 Mo. App. 8.] The board clearly has power to make all reasonable rules to promote efficiency, order and discipline in the schools and to prevent the contrary. If it be conceded that the conduct and activities of students, whether during or after school hours, tend to destroy such efficiency, order and discipline in the schools themselves, rules denouncing such conduct and providing penalties therefor are necessarily reasonable. In determining whether the conduct of any student or set of students has such effect, the courts should yield largely to the discretion and judgment of the board and require the unreasonableness of the rule to be shown by those attacking it, rather than to require the board to establish the reasonableness of the rule in the first instance, as the majority opinion seems to require.

The very sort of rule attacked by appellants has been fully approved by the highest courts of other states. [Wayland v. Board of Education, 43 Wash. 441; Wilson v. Board of Education, 233 Ill. 464.] I quote from the Wilson Case as follows:

"The bill alleges that complainants are all under twenty-one years of age and are attending the Hyde Park High School, one of the public schools of the city of Chicago, and are pursuing the course of study prescribed by the rules of the board of education and obeying all lawful rules of said board and of the teachers employed by it; that complainants are members of an organization known as Phi Sigma fraternity, an organization not connected with but distinct from said Hyde Park High School; that the meetings of said organization are held after school hours . . .

"It was the judgment of the superintendent of schools of the city of Chicago, as well as of the board of education, that membership in secret societies, known as Greek-letter fraternities or sororities, was detrimental to the best interests of the schools. Whether this judgment was sound and well founded is not subject to review by the courts. The only question for determination is whether the rule adopted to prevent or remedy the supposed evil was a reasonable exercise of the power and discretion of the board. The rule required teachers to refuse to give public recognition to such secret societies, to refuse to allow their meetings to be held in the school buildings or to allow the name of any school to be used by the organizations. The rule also required teachers to refuse to allow a member of a fraternity or sorority to represent his school in any literary or athletic contest or in any other public capacity; that parents of the pupils be informed that the board of education, the superintendent and teachers in the high schools unanimously condemned all such secret societies. The rule denied to pupils who were members of secret societies no privilege allowed to pupils not members, except the privilege of

representing the schools in literary or athletic contests or in any other public capacity. They were not denied membership in associations of pupils of the schools for literary, social, musical or athletic exercises, and were not prohibited from receiving the same benefits from those organizations that pupils not members of secret societies received. They were only prohibited from representing the schools, as members of those associations, in public contests and capacities. This was not a denial of any natural right, and neither was it an unlawful discrimination.''

The facts in the Wayland Case are singularly like those in the case at bar. I quote from the opinion:

''The appellant George Wayland, a minor eighteen years of age, sues by Russell Wayland his guardian *ad litem*, on behalf of himself and other members of the Gamma Eta Kappa fraternity. He alleges that all members of said fraternity are of school age and entitled to all the privileges of said high school; that they are unjustly prohibited from belonging to debating clubs, athletic teams, school bands, glee clubs, orchestras, cadet corps, and other kindred organizations of said school, and that, unless they withdraw from said fraternity, they will also be deprived of the customary honors attending graduation; that they have no privileges except that of attending classes; that said rules are in excess of lawful authority; that there is nothing objectionable in said fraternity; that its meetings are held at the homes of members, with the consent of their parents, every two weeks, from eight to ten o'clock p. m., and never during school hours; that they are not under the jurisdiction of the school authorities, but are under parental control; that at said meetings improper conduct is prohibited, and that a high class literary program is carried out. . . .

''Appellant further contends that, as the fraternities meet out of school hours at the homes of the members, and at no time in the school building, and as their

parents consent to this action, the board is exceeding its lawful authority in entering their homes, in withdrawing from parents the control of their children, and in dictating what the children shall or shall not do out of school hours. We think this contention unreasonable. The board has not invaded the homes of any pupils, nor have they sought to interfere with parental custody and control. They have not said these fraternities shall not meet at the various homes, nor have they attempted to control students out of school hours. The evidence shows beyond a doubt that these secret organizations, when effected, foster a clannish spirit of insubordination, which results in much evil to the good order, harmony, discipline, and general welfare of the school. We can express these conditions in no better terms than by quoting from the testimony of Professor Geiger, the principal of the high school, who says:

" 'I have found that membership in a fraternity has tended to lower the scholarship of the fraternity members; . . . the general impression that one gets in dealing with them is one of less respect and obedience to teachers. It is found that there is a tendency toward the snobbish and patronizing air, not only toward the pupils but toward the teachers; there is a certain contempt for school authority. This is in a measure, I think, aggravated by the attitude of the parent organization, which seems to encourage members of the fraternity in this contempt for school authority, and one of the most difficult things in dealing with the situation is the fact that the members have this allegiance to a general organization or headquarters, which are often located in a distant city and which it is difficult to reach and which exercises upon the members in the local school a very powerful influence. . . . In dealing with these fraternity members I have been assured more than once that they considered their obligation to their fraternity greater than that to the school.'

"The evidence of this witness, with that of the president of the school board and other school authorities,

overwhelmingly establishes the fact that such fraternities do have a marked influence on the school, tending to destroy good order, discipline and scholarship. This being true, the board is authorized, and it is its duty, to take such reasonable and appropriate action by the adoption of such rules as will result in preventing these influences. Such authority is granted by Section 2339 and subdivisions 5 and 6 of Section 2362, Bal. Code (P. C. secs. 7300, 7323). It would be difficult to confer a broader discretionary power than that conferred by these sections. Manifestly it was the intention of the Legislature that the management and control of school affairs should be left entirely to the discretion of the board itself, and not to the judicial determination of any court. These powers have been properly and legally conferred upon the board, and unless it arbitrarily exceeds its authority, which it has not done here, the courts cannot interfere with its action.''

The statutes of Washington and Illinois are substantially the same as Section 11457, Revised Statutes 1919, and confer upon school boards in those states no powers to make rules which are not within a reasonable interpretation of our own statute. The cases quoted from cannot be successfully distinguished in their essential facts from those in the case before us, and those cases should be followed by this court. The board has the clear right to exclude secret societies from the school itself. The penalties imposed for the evasion of such rule, by participation in secret society activities outside of the school, deny to such students no substantial rights guaranteed by the Constitution and laws of the State. The rule is not shown to be unreasonable or oppressive, but on the contrary it is a rule made and enforced for the best interest of the school and the great body of students. It should meet with our judicial sanction. I respectfully dissent to the opposite conclusion reached by the majority. *Elder, J.*, concurs herein.