STATE TEACHERS' COLLEGE v. MORRIS.

(In Banc. Nov. 14, 1932.)

[144 So. 374. No. 29934.]

Geo. T. Mitchell, former Attorney-General, and W. A. Shipman and W. D. Conn, Jr., Assistant Attorney-General, for appellant.

Forrest M. Morris, of Hattiesburg, for appellee.

Briefs of counsel not found.

Smith, C. J., delivered the opinion of the court.

This is an appeal from a judgment of the court below sustaining a demurrer to the plaintiff's declaration and dismissing its suit. The allegations of the declaration are, in substance, as follows:

The State Teachers' College, the plaintiff and appellant here, is a state owned and supported college, situated within the boundaries of the city of Hattiesburg. A part of its activities include the operation of a teachers' demonstration and practice school established by it under the provisions of sections 7241-7246, Code 1930. In 1930, the Legislature appropriated, by chapter 167 of the Laws of that session, twenty thousand dollars out of any funds in the state treasury not otherwise appropriated, for the support of the State Teachers' College demonstration and practice school for 1930, and a like amount for 1931.

The defendant, Morris, appellee here, is the father of two children who attended the appellant's teachers' demonstration and practice school during the scholastic years 1930 and 1931, one being in the third, and the other in the fifth, grade thereof. The city of Hattiesburg refused to pay the appellant any tuition for students residing within its separate school district attending the appellant's teachers' demonstration and practice school, and, consequently, the defendant, Morris, is liable for the payment of the tuition of four dollars per month due plaintiff by his children, amounting, in the aggregate, to seventy-two dollars, for which sum a judgment was prayed.

The grounds of the appellee's demurrer as set forth therein are as follows:

"First. That said suit against the defendant is predicated upon section 3, c. 218, of the Laws of 1930, and that said section insofar as it undertakes to make the child or the parent liable for a tuition is in conflict with section 201 of the Constitution of the State of Mississippi.

"Second. That all of chapter 218, Laws of 1930, is a discrimination against a uniform system of free public schools, and is, therefore, in violation of section 201 of the Constitution of the State of Mississippi.

"Third. That the attempted effort on the part of the the Legislature to appropriate money for the support of the said school is in violation of section 208 of the Constitution of the State of Mississippi unless the provision of chapter 218 of the Laws of 1930, requiring the child or parent to pay tuition for the common school grades is within itself held unconstitutional."

The court below sustained the demurrer on the theory that the teachers' demonstration and practice schools provided for in sections 7241-7246 are a part of the "uniform system of free public schools" which section 201 of the Constitution requires the Legislature to establish, and therefore no tuition can be charged students in attendance thereon. That section is as follows: "It shall be the duty of the Legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and, as soon as practicable, to establish schools of higher grade."

In so holding, the court below was in error. These teachers' demonstration and practice schools are not within the control of the common school authorities, but the power to establish them and regulate "the affairs" thereof is conferred on the "administrative authorities of the major state institutions of learning." In order for a school to be within the system of free public schools

required by section 201 of the Constitution, the establishment and control thereof must be vested in the public officials charged with the duty of establishing and supervising that system of schools. Otken v. Lamkin, 56 Miss. 758, and the State Teachers' College, formerly known as the State Normal College, is no part of the state's uniform system of free public schools. Turner v. Hattiesburg, 98 Miss. 337, 53 So. 681.

It is clear from the declaration that the appellant's teachers' demonstration and practice school instructs its pupils, and, the statute permits it so to do, in those elementary branches of learning embraced within the common school curriculum.

A further question therefore arises under section 201 of the Constitution, and that is, the power, vel non, of the Legislature to establish and support schools outside the common school system which teach those branches of learning within the common school curriculum. The case of Chrisman v. Brookhaven, 70 Miss. 477, 12 So. 458, 459, seems to hold that the Legislature has the power so to do. The school which the court there had under consideration was a municipal school outside of the public school system, and the court there, among other things, said: "It [referring to the Constitution] enjoins upon the Legislature to establish and maintain a uniform system of free public schools, but does not prohibit the establishment of other schools outside of its system, and the Legislature may provide for schools at pleasure not invading the constitutional scheme." The question of what branches of learning such schools could be permitted to teach was not discussed by the court; but it is clear from the report of the case that the school there under consideration was very much of the same character as those embraced in the common school system, with a curriculum similar to theirs.

But, leaving that case out of view, the same result must be reached here. The authority given the major

state institutions of learning is not simply to teach those branches of learning within the common school curriculum, but so to do within a limited scope, and for the purpose of enabling those institutions to qualify their students to become school teachers, by demonstrating to them, in a miniature school, in the teaching of which they themselves may participate, the modern and approved methods of school teaching, and thereby insure the equipment of the common school system with competent teachers. These demonstration and practice schools, therefore, are in aid of the common school system, and the number of students attending them will necessarily be so small as to be negligible when compared with the number in attendance on the schools composing that system.

It has been suggested that the Legislature's power to establish colleges and universities is conferred and measured by the provision of section 1, art. 8, Constitution 1869, now section 201 of the present Constitution, that the Legislature shall "as soon as practicable . . . establish schools of higher grade," and therefore all state owned and supported colleges and universities must be conducted as free schools. The Constitution of 1832 contained no such provision; its only reference to the subject of education being that "schools, and the means of education, shall forever be encouraged in this State." Article 7, section 14. While that Constitution was in force, the Legislature established several state owned and supported colleges, and in Otken v. Lamkin, 56 Miss. 758, it was held that the schools contemplated by the words "schools of a higher grade" in section 1, art. 8, of the Constitution of 1869, and section 201 of the present Constitution, are such as are a part of the uniform system of free public schools required by the section and are supported from the common school fund. The Legislature's power to establish colleges and universities does not rest on any grant thereof in the Constitu-

tion, but on the fact that it is not prohibited by the Constitution from so doing; not being so prohibited, it has full power to establish schools outside of the common school system. Chrisman v. Brookhaven, 70 Miss. 477, 12 So. 458, 460, including colleges and universities. Turner v. Hattiesburg, 98 Miss. 337, 53 So. 681.

This brings us to the appellee's contention set forth in his third ground of demurrer. The argument in support thereof is broader than that outlined in the demurrer, and, in substance, is that the second clause of section 208 of the Constitution prohibits a school from charging its students with tuition after it has received an appropriation of public funds, and it is to this argument that we will respond. That section of the Constitution is as follows: ''No religious or other sect or sects shall ever control any part of the school or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school.''

Two among other probable questions here arise: (1) Are schools of the character of the appellee included in the word ''school'' as used in the second clause of the section; and (2) should that question be answered in the affirmative, does the appropriation of forbidden funds to a sectarian or pay school, when accepted by the school, operate as a prohibition of its right, after ''receiving such appropriation,'' to charge its students with tuition?

A casual examination of the second clause of the section discloses that the broad scope of the word ''funds'' must be limited by construction, for, unless so limited, all funds, of every character, both public and private, are included therein; but, of course, the words were intended to apply only to public funds of some character. It being clear that some of its language is broader than the section's purpose, a careful scrutiny of the section becomes necessary in order to ascertain whether other

of its language is not also, particularly the word "School" in the second clause thereof.

The word "school" is a generic term, and may include any or all of a number of specific schools, according to the intent with which it is used. That is to say, it may include, according to the intent, elementary, grammar, and high schools; academies, colleges, and universities; publicly owned and privately owned schools.

General words in a statute must be understood as used with reference to the subject-matter in the minds of the Legislature, and strictly limited to it. 59 C. J. 980; Love v. Taylor, 26 Miss. 567; State Board of Education v. M. & O. R. R. Co., 72 Miss. 236, 16 So. 489; Kennington v. Hemingway, 101 Miss. 259, 57 So. 809, 39 L. R. A. (N. S.) 541, Ann. Cas. 1914B, 392; Dollman v. Moore, 70 Miss. 267, 12 So. 23, 19 L. R. A. 222; McIntyre v. Ingraham, 35 Miss. 25. This rule applies with equal force to the construction of words used in a Constitution. 12 C. J. 702. The subject-matter in the mind of the Convention which adopted the Constitution must be ascertained from the words used in the Constitution, their context, the purpose sought to be accomplished, and the circumstances surrounding the Convention at the time the Constitution was framed and adopted, proven within the rules of evidence so permitting, or of which the court can take judicial notice.

The appellant is a state owned and supported college, and we will assume that the word "school" as here used includes colleges. The narrow question then is, Does the word "school," as used in the second clause of section 208 of the Constitution, include public schools, or as here, state owned and supported schools?

The word "school" is used twice in the second clause of the section. As first used, it is limited by the language of the clause to sectarian schools, whether conducted as free schools or not; and, as next used, it includes schools not conducted as free schools, whether sectarian or not.

When the present Constitution was adopted in 1890, there were not, could not have been, and cannot be now, any state owned and supported sectarian school; the establishment thereof being prohibited by the provision of section 18, Constitution of 1890, that "no preference shall be given by law to any religious sect."

It is hardly probable, therefore, that the members of the Convention which framed and adopted the Constitution, many of whom were among the state's most eminent lawyers of that day, thought there could be any sectarian state owned and supported schools. Consequently, it is also hardly probable that they had such schools in mind when framing and adopting the Constitution, and therefore did not intend in that connection, to include them within the word "school."

One of the rules for construing a Constitution or statute is "that the same meaning attaches to a given word or phrase wherever it occurs" therein, unless it clearly appears that in some instances it was used with a different meaning. 12 C. J. 706. Under this rule which, of course, is not of prime importance, and should not be permitted to vary the clear meaning of words in a Constitution or statute, the presumption is that the word "school" in the second half of the second clause of the section was not intended to include state owned and supported schools. The use of the word "any" or a word of like meaning, preceding the word "school" in that part of the section, was necessary in order to clearly indicate that the prohibition applied to schools not conducted as free schools, whether sectarian or not.

This presumption is not only not overcome, but is strongly reinforced, when the history of the adoption of the section, as disclosed by public records, including the Journal of the Convention which adopted it, are considered, together with the contemporary and long-continued construction placed on the section by the Legislature and the state's executive officers charged with the

duty of administering the affairs of the colleges, which "construction should not now be departed from unless manifestly incorrect." Illinois Cent. R. Co. v. Middleton, 109 Miss. 199, 68 So. 146, 147.

Section 1, art. 8, of the Constitution of 1869 required the Legislature, as does section 201 of the present Constitution, to establish a uniform system of free public schools, and, as soon as practicable, to establish schools of a higher grade. In 1878 the then common school system did not include schools of a higher grade, such, for instance, as are commonly known as high schools, and, at that year's session of the Legislature, it attempted to supply this defect by utilizing certain private schools for that purpose, supporting them, in part, out of the common school fund, chapter 20, Laws of 1878; the reason therefor being set forth in a preamble to the statute. That statute was held to violate section 1, art. 8, of the Constitution of 1869, in Otken v. Lamkin, 56 Miss. 758. Nevertheless, privately owned and controlled schools, some of them of a sectarian character, continued to affiliate with the state's common schools, and to be supported, in part, from the common school fund. In his message to the 1890 session of the Legislature, which called the Convention that adopted the present Constitution, Governor Lowry, among other things, said: "There are one hundred and fifty proprietary high schools in the state, most of them free schools during the winter term, and pay schools the remainder of the session. They receive a generous support, and are doing valuable service, which is an additional indication of the prosperity of our people and their zeal in the cause of education." Miss. Dept. Rep. 1888-89, page 10 of the Governor's message.

This statement, as the message indicates, was based on the report made to the Legislature by the Hon. J. R. Preston, state superintendent of education, wherein he said: "In addition to the graded schools in our towns and cities, the superintendents have reported one hun-

dred and fifty high schools the names and principals of which are given in a separate list in this report. The list contains, denominational colleges, normal schools and proprietary high schools, which maintain ten months sessions. Many of them are supported, in part, by the public fund, and give free tuition during the free school term. The list, if complete, would contain at least one hundred and sixty schools. The establishment and support of such schools in all parts of the state are gratifying indications of the interest people are taking in the education of their children. These schools supply to our youth that grade of instruction usually given in the regular high schools engrafted upon the systems of public school education in other states. Their number and patronage have rapidly increased for the past few years, and their progress conclusively shows an advance in the substantial prosperity of our people, as well as a realization that they must give their children more extended educational opportunities than can be had in the free schools of the state. Many of these schools enrolled from two hundred and fifty to four hundred students last session." Miss. Dept. Rep. 1888-89.

When the Legislature of 1890 convened, to which Governor Lowry's message, and the report of the state superintendent of education were addressed, there seems to have been no statute authorizing the use of the private schools referred to in the state superintendent's report, some of which appears therefrom to have been denominational or "sectarian" schools, as a supplement to the state's common school system. In order to legalize that custom, and assuming that it had the power so to do, in which connection see Otken v. Lamkin, supra, the Legislature adopted a statute entitled "An Act to amend the school law," appearing as chapter 71, Laws of 1890, section 12 of which provides: "That educable children may attend any chartered high school in their county, and shall be entitled to be enrolled, reported and paid for as

other pupils in said school, provided said chartered school shall have been established and located as a free school."

The Convention which adopted the Constitution met in August, 1890, and its committee on education reported an article for the new Constitution covering the subject of education, section 10 of which brought forward, with a slight change, section 9, article 8, Constitution of 1869, with an addition thereto, reading in full as follows: "No religious or other sect or sects, shall ever control any part of the school, or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school."

The proposed new section, it will be observed, did not contain the words, "or to any school that, at the time of receiving such appropriation, is not conducted as a free school."

A minority of the committee made a separate report in which it was said, "We refer approvingly to the report of the State Superintendent of Education for the years 1887-8 and 1888-9," which demonstrates that the Committee on Education and the Convention had before them the report of the state superintendent of education, hereinbefore quoted. Both of these committee reports were afterwards withdrawn, and a compromise report was submitted; section 10 thereof being the same as section 10 of the original report. Convention Journal, pp. 120, 133, and 255. After the submission of this compromise report, Mr. Jamison, of the committee, offered a substitute therefor, section 9 of which was identical with section 10 of the committee's report. This substitute, after being amended, was adopted and became article 8 of the present Constitution. Convention Journal, p. 370.

While the Jamison substitute for the committee's report was under consideration by the Convention, "Mr. Burkett moved to amend Section Nine (9) by inserting after the word 'Sectarian' in Line Three, 'or private

schools not under the control of the free school authorities during the free term.' Mr. Sexton moved to amend as follows, 'But this section shall not prevent teachers of private schools from receiving of the school funds the pro rata share of the children of the county who may attend such school when it shall be established and located as a free school.' '' This proposed amendment is similar in purpose to, and in part identical with, the language of section 12, chapter 71, of the laws enacted by the Legislature at its 1890 session, as to suggest that it was inspired thereby. ''Mr. Henry moved to amend Section Nine (9) by adding thereto the following, 'Nor shall any sectarian books be used, or sectarian instruction be given in any public schools.' '' All of these amendments were laid on the table, and thereupon ''Mr. Yerger submitted the following amendment to said Section. Add to section, 'or to any school that at the time of receiving such appropriation from the state treasury is not conducted as a free school,' which amendment was adopted, and, on a further vote, Section Nine (9) was adopted as amended.'' Convention Journal, p. 356. The Convention's Committee on Revision reported the final draft of the proposed Constitution with the words ''From the State Treasury'' eliminated from section 9 of the Jamison substitute for the report of the Committee on Education, as amended by the Convention, and the section as revised was adopted, and became section 208 of the Constitution. Convention Journal, pp. 580, 581, 612, 638, and 669.

These excerpts from the Convention Journal, from Governor Lowry's message, the state superintendent of education's report, and chapter 71, Laws 1890, demonstrate that what the Convention had in mind when considering section 9 of the Jamison report was the prohibiting of the custom referred to in the report of the state superintendent of education of appropriating public funds to support of sectarian schools and to a private

school, whether sectarian or not, "that at the time of receiving such appropriation is not conducted as a free school." One of the proposed, but rejected, amendments to section 9 of the Jamison substitute was intended to apply to public schools, but its author, Mr. Henry, took the precaution to indicate that by inserting the word "public" before the word "schools."

In 1890, when the present Constitution was framed and adopted, several state owned and supported colleges, and one state owned and supported University, were in existence. Some of them were then, and had been for a long time, charging their students with matriculation fees and for instruction given them in particular branches; for instance, the University's Law School, and the Industrial Institute and College's (now Mississippi State College for Women) School of Music and the Fine Arts. Every Legislature that has met since the adoption of that Constitution forty-two years ago, and the state officers charged with the duty of administering the affairs of the State's University and colleges, have uniformly construed the second clause of section 208 of the Constitution as not prohibiting these institutions from charging their students with such fees and tuition, and they (these institutions) have continuously so charged their students until now; and, when the second clause of that section is construed in the light of its history as disclosed by the public records, including the Journal of the Convention which framed and adopted it, it seems clear that the Convention did not have state owned and supported schools, including the State's University and colleges, in mind, and that it was no part of its purpose to interfere with the Legislature's power over them. Had the Convention intended to increase the expense to the state of maintaining its University and colleges, by prohibiting them from charging their students with matriculation fees, and with tuition in their schools of a special character, thereby probably abolishing the lat-

ter, it could have easily and clearly, and in all probability would have, indicated that intention by the use of words specifically setting it forth. Moreover, the Convention's meetings were open to the public; nothing was done by it "in a corner;" and, had it intended to reverse a long-settled public policy with reference to the State's University and colleges, it is hardly probable that this fact would not have attracted public attention, particularly the attention of the Legislature and of the State University and college authorities. It could not have remained a secret until now.

It follows from the foregoing views that the first of the two questions hereinbefore set forth must be answered in the negative, and therefore it becomes unnecessary for us to answer the second.

The appellant has the right to charge students attending its teachers' demonstration and practice school with tuition, and this record disclosed nothing that would relieve the appellee from paying the tuition which the appellant seeks to collect from him.

The demurrer should have been overruled.

Reversed and remanded.

**Ethridge, J.,** delivered a dissenting opinion.

I am unable to agree with the majority opinion in this case. I think chapter 218, Laws of 1930 (Code 1930, secs. 7241-7246), violates both sections 201 and 208 of the State Constitution.

As held in Otken v. Lamkin, 56 Miss. 758, a uniform system of free public schools was provided for in section 201 of the Constitution, and similar sections in prior Constitutions, which required such schools to be under the supervision of the common school authorities; and chapter 218, Laws of 1930, establishes exactly the same grade and character of schools as is contemplated under section 201 of the Constitution which provides that the

Legislature shall establish "a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and, as soon as practicable, to establish schools of higher grade," without being under such supervision. In 8 Words and Phrases, First Series, page 7178, under the title, "Uniform System of Common Schools," it is said that: "The word 'uniform,' as used in Const. art. 6, sec. 2, providing that the Legislature shall establish a uniform system of common schools, requires uniform educational facilities. Such facilities may be maintained with great simplicity of organization in sparsely settled regions, while the most elaborate machinery is necessary to meet the requirements of dense populations in cities. The system of schools, however, is uniform. Divisions and classifications of children in various respects may be necessary in the city, and not in the country, in order to obtain the best results from the facilities afforded. The facilities themselves, however, remain uniform.

In construing a Constitution, attention must be given to every word used therein, and, in the construction of section 201 of the State Constitution, schools must be uniform, and must be free, and each of these words has a distinct and clear meaning; and it is not within the power of the Legislature to create schools of the same type, grades, etc., for favored children or favored localities. This is further indicated and made manifest by section 90, which section provides that the Legislature shall not pass any local, private, or special laws in a number of enumerated cases, which shall only be provided for by general laws, and clause P of that section reads as follows: "Providing for the management or support of any private or common school, incorporating the same, or granting such school any privileges."

If chapter 218, Laws 1930, sections 7241-7246, Code 1930, is given operation, the major state institutions of learning will be given power to conduct schools specially

provided for in section 201 of the Constitution without having such school under the control of the educational authorities of the county and the state superintendent of education, and will give to the children attending such schools privileges that are not accorded to children attending the public schools generally. The act, chapter 218, Laws of 1930, gives to the college authorities the right to charge tuition for each grade in these practice schools, the amount of the tuition being fixed by statute, and to credit this tuition with the amount each child would be entitled to pro rata on the basis of the amount that would be otherwise paid by the superintendent out of the common school fund of the county. The fact that several higher institutions of learning are each given leave to create such schools does not prevent the schools so created from being schools of the same character and class as those provided for by the Constitution. They are clearly not a uniform system of schools, and are not free schools open to all students alike. This act makes a vital inroad into the principles of equality and uniformity which the Constitutional Convention established. It was the manifest intention of the Constitutional Convention to authorize the Legislature to make no distinction between the children of communities of the state. The State Teachers' College has been adjudicated not to be a part of the common school system of schools. Turner v. Hattiesburg, 98 Miss. 337, 53 So. 681. Therefore grammar grades, high schools, and junior high schools, etc., are each a part of the uniform system, and cannot be maintained in such institutions under the plan for such grades, free from the control of the county superintendent of education, and the school trustees provided for by law.

The major institutions of learning were not created for the purpose of conducting free public grammar and high schools, and, if the statute is valid as to teachers' practice schools in these higher institutions of learning,

and if they must be furnished pupils to teach while being trained as teachers, the same principle could be applied, without limit, to any other course of training in the schools of higher learning. They might soon be found furnishing clients to lawyers, patients to physicians and dentists, and customers or pupils to various other schools, which would convert these institutions into mammoth institutions for dissipating public funds.

Chapter 218, Laws 1930, also clearly violates section 208 of the Constitution, which reads that "No religious or other sect or sects shall ever control any part of the school or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to *any school that at the time of receiving such appropriation is not conducted as a free school.*" (Emphasis supplied.) It seems to me that the language of this section is so plain that no kind of resort to any rules of construction is required or can properly be resorted to. This section is in the chapter on education, and the words, "school or other educational funds of this state," are broad and comprehensive, and embrace any character of educational funds.

In the Constitution of 1869, art. 8, sec. 9, it was provided that, "No religious sect or sects shall ever control any part of the school or university funds of this State." In 1869, when the Constitution was adopted, the only state institution of higher learning supported by public funds was the State University. However, Congress had passed land grants in aid of public education, and the Legislature was enjoined by the Constitution of 1869 to provide schools of agriculture, etc., and appropriate the land donated by Congress to this state for that purpose. Section 8, Mississippi Constitution of 1869. In compliance with that injunction, the Legislature established the A. & M. College at Starkville, the Alcorn A. & M. College at Rodney (for colored students), and the I. I. & C. at Columbus for women, all of which

schools were in existence in 1890, when section 208 was adopted.

The amendments that were offered in the Constitutional Convention are set out in the major opinion; but the major opinion is in error in assuming and holding that the purpose of the amendments was merely to prevent state aid to private institutions of learning. That was, indeed, part of the purpose of the change in the constitutional provision, but it was not all of the purpose. The major opinion segregates section 208 into different parts, and attributes different meanings to the various parts, which is wholly unwarranted, in my judgment. It is held, in effect, that no religious sect or sects can ever control any of the public school funds, or other educational funds of the state, and that no part of any such funds shall ever be appropriated to the support of any sectarian school; and then the rest of the section is treated as a different part of the Constitution, governed and controlled by different principles.

The section is to be construed as reading, "No religious or other sect or sects shall ever control any part of the school or other educational funds of this state; nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school." The section makes it plain that it does not limit or restrict the meaning to the common school fund, but that it is applied to all educational funds of this state. No such funds shall be appropriated toward the support of any sectarian school, and no part of the funds, either the common school or educational fund, shall ever be appropriated to any school that at the time of receiving such appropriation is not conducted as a free school. This section leaves out the word "public" as used in section 201, and also leaves out the word "uniform" as therein used. The omission of these words is significant; it indicates the manifest purpose of requiring *any* school

that receives part of the educational funds of the state to be conducted as a *free* school at the time of receiving any state money. The words "free school" have a clear signification. They are to be used in the sense of being free of charge for tuition. It was said in Attorney General v. Bishop of Worcester, 68 English Reprint, page 531, that the "term 'free school' is flexible in its meaning, and must be construed according to the context and usage. It has no reference to the instruction given, but to the terms on which it is given." Black's Law Dictionary (2 Ed.), page 523, defines the word "free" as "Available to all citizens alike without charge, as a free school." In the case of Le Couteulx v. City of Buffalo, 33 N. Y. 333, 337, it was held that, in defining "free school" as used in a deed conveying land to the city, a free school is one open for the children of all classes, and indicates a school free in a pecuniary sense, and in respect to the expenses or charges for tuition. It is not synonymous with common schools, although common schools are synonymous with public schools. In re Malone's Estate, 21 S. C. 435, the term "free public school," as used in Const. art. 10, sec. 11, providing that the proceeds of all escheated property "shall be faithfully appropriated for the purpose of establishing and maintaining free public schools, and for no other purposes or uses whatever," means school supported by the public, for the use of the public generally, and hence does not include an orphan house under the control of a city, open only to poor orphan children, or the children of poor, distressed, or disabled parents.

In St. Joseph's Church v. Tax Assessors of Providence, 12 R. I. 19, 34 Am. Rep. 597, it was held that an act exempting from taxation "free public schools" meant only schools established and regulated under the statute laws of the state.

In the case, In re City of Pawtucket, 24 R. I. 86, 52 A. 679, it was held that a chapel used in part for religious

worship and in part for a teachers' residence, in a free parochial school on an adjoining lot was not exempt from taxation under the law.

In State v. Maryland Institute for the Promotion of Mechanic Arts, 87 Md. 643, 41 A. 126, it was held that the constitutional provisions requiring the establishment of schools meant that such schools must be open to all, without expense.

Section 208 of the Mississippi Constitution intends to limit public funds to the support of free schools, and to prevent charges of tuition in state-supported institutions whose teachers and officers are paid from the public funds. See, also, Bolick v. Cox, 145 Ga. 888, 90 S. E. 54; Segar v. Bd. of Education, City of Rockford, 317 Ill. 418, 148 N. E. 289; State v. Valley City Special School District, 42 N. D. 464, 173 N. W. 750. In this last case it was held that the state was entitled to recover from the school district the tuition authorized by law, as the State Normal School was a part of the free public school systems of North Dakota. This case is authority for the proposition that a school of higher learning is a school within the meaning of the constitutional provisions upon the subject.

A careful reading of the Constitution of 1890 shows that the State Constitutional Convention was dominated by a democratic spirit, and desired, as far as possible, to place all the people of the state upon a basis of equality— equal rights and privileges throughout the state. Prior to 1890 there was a great wave of agrarian democracy which swept over the state, whose dominant battle cry was, "Equal rights to all, and special privileges to none." The old caste system of ante bellum days was swept away in the tide of democracy.

It seems to me that there could be no doubt from the language used in section 208, construed in connection with the other provisions pertinent to the subject, that it means that schools receiving state aid must be con-

ducted as free schools, although they may not be open to everybody, nor required to be uniform. In other words, the section recognizes that it was desirable to have the citizenship of the state educated in the higher branches of learning, and that such schools should be provided and maintained by the state; but, when the state did establish such schools supported by state funds, the tuition therein must be free. It was not contemplated that lodgings and board therein should be free, but that the tuition should be free, and that the instructors should deal with all on a basis of equality; and the purpose of the section was to encourage those of limited means to seek education in the higher branches of learning by furnishing free tuition.

The school authorities have no right to subvert the purpose of the Constitution.

In construing a Constitution, the cardinal rule is that the instrument must be construed so as to give effect to the intention of the people who adopted it. This intention is to be sought in the Constitution itself, and the apparent meaning of the words employed is to be taken as expressing it, except in cases where that assumption would lead to absurdity, ambiguity, or contradiction. Black's Const. Law, p. 76.

There are fifteen subsidiary rules of constitutional construction by which the meaning is to be determined when the instrument is ambiguous. The first rule states that the construction shall be uniform; the second, that in case of ambiguity the whole Constitution is to be examined; the third, that it should be construed with reference to, but not overruled by, the common law and previous legislation; the fourth, that it should not be construed retrospectively, unless that was the intention of the authors; the fifth, that its provisions are almost invariably mandatory, and only in plain cases, or under pressure of necessity, can they be construed as directory; the sixth, that whatever is necessary to render effective

any provision must be deemed as implied; the seventh, that, when the Constitution grants a power in general terms, such grant includes all auxiliary powers necessary to make it effectual; the eighth, that the words employed in a Constitution are to be taken in their natural and popular sense, unless technical terms, in which event they are to be taken in their technical signification; the ninth, that the Constitution's preamble may furnish some evidence of its meaning, but arguments drawn therefrom have little weight; the tenth, that it is not permissible to disobey a constitutional provision because it may work a hardship; the eleventh, that in case of ambiguity resort may be had to extraneous facts, such as prior state of the law, evil to be remedied, circumstances of contemporary history and discussions of the Constitutional Convention; the twelfth, that contemporary construction and its practical construction are valuable aids in determining its meaning, but these aids must be resorted to with caution and reserve, and they can never be allowed to abrogate, contradict, enlarge, or restrict the plain and obvious meaning of the text; the thirteenth, that, where a clause which has received a settled judicial construction is adopted in the same words by the framers of another Constitution, it will be presumed that the construction thereof was likewise adopted; the fourteenth, that the schedule to a Constitution, being temporary, should not be allowed to abrogate or contradict the provision of the permanent part of the Constitution; and, fifteenth, that the principle of stare decisis applies with special force to constitutional construction.

It is possible for a person, or a court, in construing a section of the Constitution, to ignore some of these rules and enlarge others, to make the Constitution mean what the person construing it desires it to mean, rather than what the Convention which framed it intended it to mean.

I think the meaning of the provisions in section 208 of the Constitution is so clear that no rules of construc-

tion are properly brought into play. When section 208 is construed in connection with section 207, it will be apparent that the Convention meant the word "schools" to be used in a comprehensive sense, and to embrace all schools supported by the state. Section 207 provides that separate schools shall be maintained for children of the white and colored races. If the interpretation is placed upon this section 207 that is placed upon section 208—and I think it is just as susceptible as section 208—then there would be no requirement for separate schools of higher learning for the white and colored races.

The majority opinion in construing section 208 of the Constitution ignores entirely the meaning of the word "schools" used in section 207. The latter section provides that separate schools shall be maintained for children of the white and colored races. Unquestionably "schools" is used in that section in its comprehensive sense. It means all schools of every kind and character, including state colleges maintained at public expense. The first clause of section 208 is used in the same sense. The majority opinion seems to concede that. To hold that the same word in the last clause of section 208 applies only to the common free schools, and not to the state colleges (as the majority opinion does) violates the well-established rule in this country of constitutional and statutory construction that, where a word is used, in a Constitution or statute in an unmistakable sense, and is again therein used, the presumption is that they have the same meaning, unless a different meaning is clearly indicated. This rule is of especial force where the same word is used in treating a particular subject-matter in the same section. Green v. Weller, 32 Miss. 650; State v. Skeggs, 154 Ala. 249, 46 So. 268; Epping v. Columbus, 117 Ga. 263, 43 S. E. 803; Black's Constitutional Law, 77; Decennial Digests, Constitutional Law, sec. 14; Century Dig. Const. Law, sec. 11.

The whole system indicated in the chapter on education in the Constitution is that the schools supported by the state shall be free schools, and that they shall be kept separately for the members of the different races.

Instead of the majority opinion adopting the plain and obvious meaning of section 208, it has brought into play ingenious argument and minor subsidiary rules of constructions to sustain the practices of the school authorities, at the expense of the plain meaning of the constitutional provisions. There is no room for contemporaneous construction.

If what is assumed to be true is true, the school authorities have ignored the Constitution in charging tuition in some departments of the schools. It is said in Rule 12, above quoted from Black's Constitutional Law, in referring to contemporaneous construction, "but these aids must be resorted to with caution and reserve, and they can never be allowed to abrogate, enlarge, or contradict the plain and obvious meaning of the text."

The legislators should address their minds to what instructions shall be given in all institutions, and make appropriation for whatever it deems proper within constitutional limits; but it has no right to override policies established by the Constitutional Convention itself. It may provide for the support of any school, professional or otherwise, to be taught in any college or university it may desire; but school trustees may not lawfully charge tuition to any of them.