McNAIR, APPELLANT, *v.* SCHOOL DISTRICT No. 1 OF
CASCADE COUNTY ET AL., RESPONDENTS.

(No. 6,697.)

(Submitted May 8, 1930.   Decided May 22, 1930.)

[288 Pac. 188.]

*Mr. Art Jardine,* for Appellant, submitted a brief and argued the cause orally.

*Messrs. Clift & Glover* and *Messrs. Cooper, Stephenson & Hoover,* for Respondents, submitted a brief; *Mr. W. H. Hoover* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Chester S. McNair, a taxpaying freeholder of Cascade county, has appealed from a judgment of dismissal entered in an injunction proceeding instituted by him to prevent School District No. 1 of Cascade County, and its board of trustees, from selling certain bonds. To the complaint filed the defendants interposed a demurrer, which was sustained, and, the plaintiff refusing to further plead, judgment for the defendants followed.

It appears that School District No. 1 of Cascade County, which includes the city of Great Falls, recently completed a million dollar high school, and thereupon more than twenty per cent of the qualified electors and taxpayers of the district

petitioned the board of trustees to call an election to determine whether or not the board should issue and sell bonds for two distinct purposes, the first question to be presented being the issuance of bonds to raise $150,000 for the furnishing and equipping of the high school; the second: "Shall the board * * * be authorized to issue and sell bonds * * * in the amount of * * * $90,000 * * * for the purpose of constructing an outdoor gymnasium and athletic field in said district, furnishing and equipping the same."

McNair's complaint challenges the board's authority, under the law, to issue and sell the bonds for this second purpose. It shows that all steps taken for the holding of the election, the conducting of the election, and the issuance of the bonds were duly and regularly taken, and that the prescribed notice of sale has been given, under which, unless restrained, the board will on June 2, 1930, offer for sale, and sell to the highest bidder for cash, this $90,000 bond issue. Thus the only question presented for our determination is: Has the board of trustees of a school district the power and authority to issue and sell bonds for the purpose of constructing and equipping an outdoor gymnasium and athletic field in connection with a high school?

A school district is a political subdivision of the state, created for the convenient dispatch of public business. (*State ex rel. Redman* v. *Meyers,* 65 Mont. 124, 210 Pac. 1064.) It is a public corporation. (*Henderson* v. *School District,* 75 Mont. 154, 242 Pac. 979; *State ex rel. School District* v. *Urton,* 76 Mont. 458, 248 Pac. 369.) The board of trustees, therefore, constitutes the board of directors and managing officers of the corporation, and may exercise only those powers expressly conferred upon them by statute and such as are necessarily implied in the exercise of those expressly conferred. The statute granting power must be regarded both as a grant and a limitation upon the powers of the board. "This is the rule of construction applicable to all statutes granting and defining the

426

powers of such municipal or quasi-municipal bodies." (*State ex rel. Bean* v. *Lyons*, 37 Mont. 354, 96 Pac. 922, 925.)

The latest expression of the legislature as to the power of such a board in this regard is found in Chapter 147, Laws of 1927, wherein (section 1) it is declared that "the Board of Trustees of any school district within this State is hereby vested with the power and authority to issue and negotiate coupon bonds on the credit of the school district for any one or more of the following purposes:

"(a). For the purpose of building, enlarging, altering, repairing, or acquiring by purchase one or more school houses in said district; furnishing and equipping the same, and purchasing the necessary lands therefor.

"(b). For the purpose of constructing or acquiring by purchasing one or more teacherages in said district, furnishing and equipping the same, and purchasing the necessary lands therefor.

"(c). For the purpose of constructing or acquiring by purchasing one or more dormitories in said district, furnishing and equipping the same, and purchasing the necessary lands therefor.

"(d). For the purpose of constructing or acquiring by purchasing one or more gymnasiums in said district, furnishing and equipping the same, and purchasing the necessary lands therefor. * * * "

Under the above rules, if these defendants have power to issue and negotiate the bonds in question, their authority therefor must be found in one of the four subdivisions just quoted.

The intention of the legislature in enacting a statute is the consideration which must control in its construction (sec. 10520, Rev. Codes 1921), and, to ascertain that intention, recourse must first be had to the language employed (*State* v. *Cudahy Packing Co.*, 33 Mont. 179, 8 Ann. Cas. 717, 114 Am. St. Rep. 804, 82 Pac. 833), and the apparent purpose to be subserved. (*State ex rel. Vickers* v. *Board*, 77 Mont. 316, 250 Pac. 606). "Words and Phrases as used in our Codes are

to be construed according to the context and the approved usage of the language, unless clearly used in a technical sense (sec. 15, Rev. Codes 1921), and where a term used in a statute is not of a technical nature, nor one which has acquired a peculiar meaning in law, and is not defined in the Codes, it must be understood in its ordinary sense and with the meaning commonly attributed to it. (*Northern Pac. Ry. Co.* v. *Sanders County*, 66 Mont. 608, 214 Pac. 596.)'' (*State ex rel. Keane* v. *Board of County Commrs.*, 83 Mont. 540, 273 Pac. 290, 293.)

What, then, did the legislature intend should be the extent of the power and authority of a school board with reference to providing for the education of our children and youths, when that body enacted Chapter 147 of the Laws of 1927?

Construing that enactment literally, as counsel for the plaintiff would have us do, no authority is found in the statute for the establishment and equipment of laboratories, domestic science rooms, manual training shops or playgrounds; yet it is a matter of common knowledge that all these modern adjuncts to education were maintained in, and in connection with, schools at the time the Act was passed.

Speaking literally, the ''necessary lands'' for the erection of the buildings enumerated would be only sufficient to accommodate them; yet no one will contend that a school board in a city had performed its whole duty by the erection of a schoolhouse on the plan of a grocery-store, covering the entire lot purchased and opening directly upon the street and compelling the pupils to remain indoors throughout the school day, and, on dismissal, pass directly into the street.

Under the heading ''Education,'' our Constitution declares that ''it shall be the duty of the legislative assembly of Montana to establish and maintain a general, uniform and thorough system of public, free, common schools.'' (Sec. 1, Art. XI.) This is ''a solemn mandate'' to the legislature (*Evers* v. *Hudson*, 36 Mont. 135, 92 Pac. 462) which has been obeyed by the enactment of our school laws, in which the matter of providing

428

and carrying out the details of establishment and maintenance is necessarily delegated to the school officials.

What, then, constitutes a "thorough" system of education in our public schools? By its voluntary act, the state has assumed the function of education primarily resting upon the parents, and by laws on compulsory education has decreed that the custody of children be yielded to the state during the major portion of their waking hours for five days in the week, and, usually, nine months in the year. In doing so, the state is not actuated by motives of philanthropy or charity, but for the good of the state, and, for what it expends on education, it expects substantial returns in good citizenship. With this fact in mind, it is clear that the solemn mandate of the Constitution is not discharged by the mere training of the mind; mentality without physical well-being does not make for good citizenship—the good citizen, the man or woman who is of the greatest value to the state, is the one whose every faculty is developed and alert.

Education may be particularly directed to either mental, moral or physical powers or faculties, but in its broadest and best sense it embraces them all. (*Mount Hermon Boys' School* v. *Gill*, 145 Mass. 139, 13 N. E. 354.) To educate is to "lead forth, bring up * * * to develop physically," and education is "the totality of the qualities acquired through individual instruction and social training, which further happiness, efficiency and capacity for social service of the educated." (Webster's New Int. Dictionary.) Herbert Spencer declared that "to prepare us for complete living, is the function which education has to discharge." "Wherever education is most general, there life and property are the most safe, and civilization of the highest order. The public school is one of the main bulwarks of our nation." (*State ex rel. Kelley* v. *Ferguson*, 95 Neb. 63, 50 L. R. A. (n. s.) 266, 144 N. W. 1039, 1043; *Hardwick* v. *Board of School Trustees*, 54 Cal. App. 696, 205 Pac. 49.)

As was well said in *Piper* v. *Big Pine School District,* 193 Cal. 664, 226 Pac. 926, 930: "The public school system of this state is a product of the studied thought of the eminent educators of this and other states of the Union, perfected by years of trial and experience. Its adaptability to the genius of western development and expansion makes it peculiarly important to those who choose to remain in this state where its influence will be felt. * * * The common schools are doorways opening into chambers of science, art, and the learned professions, as well as into fields of industrial and commercial activities."

Under the head of "Education" in the fourteenth edition of the Encyclopedia Britannica, the author says it is the function of education "continuing, supplementing and (too often) correcting the influence of family life, to bring to bear upon the pupil spiritual forces which are typical of the national *ethos* and to train him to take his part in conserving and developing the life of the community." Speaking of the English schools, the author continues: "It is well known that respect for physical vigor and prowess, good manners, public spirit, self-restraint and a training in the responsible use of freedom and self-government are the main ingredients fused in the powerful social ideals of those schools. All these are valuable elements in the formation of any citizen and should, accordingly, find their place in the life of schools of every type." In the building of citizens our ideals should be as high as those of our British cousins.

The World War taught the necessity for, and gave an impetus to, greater attention to physical training as a legitimate function of education, and throughout the nation schools of all grades have, during the past ten or twelve years, devoted more time and expense to this subject of education than ever before in this country, and we may assume that the legislative assembly of 1927 was not unmindful of these facts. However, the idea is not new; the Greeks divided their subjects of education into two groups, under the heads "Music" and "Gymnas-

tics," the first comprising all mental, the latter all physical, training. We are told that, in the intervals of running, wrestling and the like, the Greek youths discoursed with philosophers who had come to watch the games, on the good, the beautiful and the true. Here we have the picture of the ideal "athletic field and outdoor gymnasium."

The term "Gymnasium" used in our statute is variously defined. Funk & Wagnall's Standard Dictionary defines it: "1. In modern usage, a building or room for the practice of gymnastic exercises, as distinguished from field athletics, but often including a rowing tank, a cage for winter practice of baseball, etc. Gr. Antiq. A place where the Greek youths exercised themselves, comprising grounds for running and wrestling, baths, porticos and rooms for conversation and discussion." Webster's New International Dictionary does not make the distinction attempted above, but defines a gymnasium as "a place or building where athletic exercises are performed; a school of gymnastics."

If we take the Funk & Wagnall's definition as embodying the common acceptation of the term "gymnasium," and, as the statute places no restriction upon the extent or cost of such a structure, the defendants could, and could only, carry out their purpose by erecting walls around the field and placing a roof over it, thus completing a "building." But we are of the opinion that the later definition given in the New International Dictionary may well be accepted as containing the idea of a gymnasium which the legislators had in mind in 1927.

This court has held that the term "schoolhouse," as used in the statute, does not mean simply the house, but refers to the entire school plant (*State ex rel. Jay* v. *Marshall*, 13 Mont. 136, 32 Pac. 648), and, under statutes at least no broader than ours, it has been uniformly held that playgrounds established and used in connection with public schools are a part of the school plant, and their taking for that purpose is a taking for a public use; that such ground is as essential to the school as is the ground on which the schoolhouse stands. (*State ex*

*rel. School District* v. *Superior Court,* 69 Wash. 189, 124 Pac. 484; *Independent School District* v. *Hewitt,* 105 Iowa, 663, 75 N. W. 497; *Cousens* v. *Lyman School District,* 67 Me. 280; *Ferree* v. *School District,* 76 Pa. 376.) What playgrounds, with their swings, chutes, teeters and the like, are to the grade schools, athletic fields are to high schools and stadiums to our universities; the difference is only in extent and dignity, not in kind, and it would seem that, if the first are legitimate parts of the school plant, so are the second and third.

In upholding a bond issue for the purpose of erecting a building for the teaching of dramatics and athletics, although statutory authority existed only for such issue for the purpose of erecting "school buildings," the supreme court of Kansas said: "We have been cited to no authority holding, and we would be reluctant ourselves to hold, that the study of dramatic expression, or that physical training, were not educational subjects. It is a matter of common knowledge, of which this court may take judicial notice, that such subjects are taught in practically all the high schools, colleges, and universities in this state." (*Woodson* v. *School District,* 127 Kan. 651, 274 Pac. 728, 730.) And in Arizona, where the statutory authority to issue bonds extended only to the purpose of erecting "schoolhouses," the supreme court found therein sufficient authority to warrant the issuance of bonds for the construction of a high school stadium, to all intents and purposes an "athletic field and outdoor gymnasium." (*Alexander* v. *Phillips,* 31 Ariz. 503, 52 A. L. R. 244, 254 Pac. 1056.) This result was reached by holding that a schoolhouse is a place "appropriated for a use prescribed or permitted by law to public schools," and, finding that school boards were empowered to add special courses to the prescribed branches of study and employ instructors, and that the school in question had added physical culture and athletics and employed instructors, the court pointed out the benefits of such training, and then said: "It seems to us that, to hold things of this kind are less fitted for the ultimate purpose of public schools, to-wit: The making of

good citizens, physically, mentally and morally, than the study of algebra and Latin, is an absurdity. Competitive athletic games, therefore, from every standpoint may properly be included in a public school curriculum," and "a structure whose chief purpose is to provide for the better giving of such competitive athletic games and sports, as aforesaid, is reasonably a school house within the true spirit and meaning" of the law.

We need not strain the popular conception of a schoolhouse ▆▆ to reach our conclusion; specific authority is given school districts to erect gymnasiums, and the common acceptation of that term may well be "a place" as well as a building. Authority to add to the prescribed course of study is given in section 1015, Revised Codes of 1921 (subd. 17) and, having provided for athletic training in the school and for proper instructors, a place for the giving of such instruction, whether within or outside of a building, becomes a necessary part of the school plant, and, under the true spirit and meaning of Chapter 147, Laws of 1927, above, the board is authorized to issue bonds therefor.

The judgment is affirmed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN and FORD concur.

MR. JUSTICE ANGSTMAN, being absent, did not hear the argument and takes no part in the foregoing decision.