MORRIS *et al. v.* VANDIVER *et al.*

(In Banc. Jan. 2, 1933.)

[145 So. 228. No. 30258.]

Frank E. Everett and Oscar V. Townsend, both of Indianola, for appellants.

Herring & Wiley, of Ruleville, and Moody & Johnson, of Indianola, for appellees.

**Ethridge, J.,** delivered the opinion of the court.

The appellants filed a bill in the chancery court, seeking an injunction against J. S. Vandiver, superintendent of the Sunflower Agricultural High School, situated at Moorhead, Sunflower county, Mississippi, and the board of trustees of said school, alleging that the complainants

were citizens and taxpayers of said town and county, having children of school age who had theretofore, during the scholastic year of 1930-1931, attended said school, which is a county school, operated by a general tax levy imposed upon the taxable property in the counties of Sunflower, Humphreys, and Leflore, and maintained as an agricultural high school which the children of petitioners are entitled to attend; that they had theretofore completed their grammar school grades, and there being no other high school within a number of miles of said community, said children had attended said school prior to the 18th day of January, 1932, on which date the defendant J. S. Vandiver unlawfully, and without cause or provocation, dismissed the children of said petitioners, together with others, directing them not to attend said school unless they should pay the sum of thirteen dollars, consisting of five dollars for athletic privileges, three dollars for library fees, and five dollars for literary fees. As a matter of fact, said Vandiver had no right, as superintendent of said school, to demand said sum or any part thereof, such charge being unlawful, unreasonable, and unjust, and he having no authority to make such demand.

They further allege that they had no adequate remedy at law by which they could restore their children to the said school, and that they were entitled to an injunction to prevent said superintendent of the said agricultural high school from refusing to receive said children, or interfering with them in their said school rights.

A writ of injunction was granted, and the defendants were summoned and answered the bill, in which answer they admitted charging the fee, as set out, but claimed authority to do so by virtue of the resolution or order of the board of trustees of the said agricultural high school, fixing said charges, and authorizing the superintendent to expel or refuse to allow children to attend whose parents were able to pay said fees, unless the same were paid.

In the answer it was claimed that this charge was necessary for the conduct of the school, and that no par' thereof was for tuition—no part was intended to be paid teachers in the school. The order set forth by the defendants as justifying the charge reads as follows: ''In the matter of payment of fees by local students the superintendent was instructed to collect all fees as far as possible, using his best discretion. Unless all students make satisfactory arrangements with the superintendents, he is hereby authorized by the Board of Trustees to ask any student to remain from school until said matter is adjusted.''

They admit that the children of the appellants were entitled to attend the said school; but contend that they were chargeable with the said fees, and that same were reasonable, and were part of the exercise of power granted to the trustees. It was proved by the minutes of the board of trustees that the following fees were fixed for the agricultural high school, and for the junior college students, in the said agricultural high school and junior college:

''Sunflower A. H. S. Students

| | |
|---|---:|
| Athletic Privileges | $ 5.00 |
| Doctor's Fee | 5.00 |
| Medicine Fee | 1.00 |
| Lyceum and Chautauqua | 4.00 |
| Literary Fee | 5.00 |
| Board, Heat, Lights, etc. | 123.00 |
| | $146.00 |

Sunflower J. C. Students

| | |
|---|---:|
| Athletic Privileges | $ 5.00 |
| Doctor's Fee | 5.00 |
| Medicine Fee | 1.00 |
| Lyceum and Chautauqua | 4.00 |
| Literary Fee | 3.00 |

Physical Education Fee ...................... 2.00
Board, Heat, Lights, etc. ...................... 123.00

$151.00

Local Students S. A. H. S.
Athletic Privileges ...........................$  5.00
Literary Fee .............................. 5.00
Library Fee ...........................: .......... 3.00

$ 13.00

Local Students S. J. C.
Athletic Privileges ...........................$ · 5.00
Literary Fee .............................. 8.00
Library Fee ................................. 3.00
Physical Education Fee ......................· 2.00

$ 18.00"

On the 12th of June, 1929, the following order appears:
"In order to meet the increased expenses of literary and athletic contests throughout the year I recommend a five dollar increase in fees for all students."

This was recommended by the superintendent, and the recommendation was adopted by the board on April 10, 1930, as evidenced by the following order:

"The Board of Trustees of the Sunflower Agricultural High School and Junior College with Humphreys county co-operating met in regular session on April 10, 1930, with the following members present. (Names of trustees.)

"On motion duly made and seconded, and carried, the fees of transported children were revised to be eight dollars in 1930-1931, instead of thirteen dollars as of the session 1929-1930."

On May 5, 1931, at a meeting of the board of trustees, the superintendent recommended that all students be charged the same fees for the next session that were charged for this session.

On the 10th day of December, 1931, at a meeting of the board of trustees, the following order was entered: "In the matter of payment of fees by local students, the superintendent was instructed to collect all fees as far as possible, using his best discretion. Unless all students make satisfactory arrangements with the superintendent, he is hereby authorized by the board of trustees to ask any student to remain from school until said matter is adjusted."

The superintendent made a report as follows: "As to payment of fees by local students—will say that all have paid or arranged with us (two or three students are sick or absent), except Joe Morris and George Knapp. The parents of these boys have been notified to come before you at this meeting. We have used our best judgment, and believe that a large part of the fees will be paid."

The superintendent testified:

"We have had fees there ever since we came there. They adopted them first, then when we became a Junior College in 1928, the present fees were adopted, and in the next year, in order to accommodate the transported students—all fees were thirteen dollars for local students —that is all local students in 1928—the next year they were lowered to eight dollars for transported students, and local students thirteen dollars, and all boarding students thirteen dollars—that is for the high school students—of course the college students were all eighteen dollars. Now those fees have been continued—no changes made in these fees the past year at all—and still on the minutes as continued, and followed out. I made the announcement the first day of school that these fees were to be paid and collected this year.

"Q. For what purpose are those fees adopted? A. For the carrying on of the extra-curricular additions to the school—the athletic, literary, and then the successful operation of the library.

"Q. So far as they apply—are they applicable to all students to which they apply? A. Every student has access—

"Q. I mean are the fees paid? A. Yes, all fees—

"Q. What class of students applicable to? A. Applicable to all—no exceptions made at all—except, of course in case any parent is unable—the board asked me to use my best judgment and discretion so that they can make some arrangements—"

He further testified that the library fee of three dollars was to supplement the periodicals, library books, etc., and that on payment of the fee all the privileges of the library, containing magazines, periodicals, books, papers, etc., were accessible to every student in high school and college. He further testified that the athletic fee of five dollars was for the purpose of maintaining games and athletic contests—that they had a physical education program for students, and it was estimated that they had fifty games, which every student would be entitled to attend during the year, out of these fees. Further, that the literary and athletic meets are free to the students, who on payment of these fees have all privileges—entrance to athletic and literary events, use of the courts, not only during the school term, but in vacation, when the local students use them—they are practically in use every day. He stated that it is necessary to have students participate in these events, which they enjoy, and which encourages the school spirit.

He further testified: "The literary fee of five dollars goes to the admission of these students to public speakers—we have a number of them to attend—and to the participation in these literary rallies—and going toward buying the music for the orchestra, and band—and special duties and occasions—all students are eligible to take part in the orchestra and in the general exercises at chapel—We give a number of free entertainments every year, to which the students are admitted from these fees. That is also for the transportation and the sending

of the teams—literary teams and debates—and for literary examinations—they hold literary examinations every year, the State Literary and Athletic Association, holds these literary examinations, and those fees go toward that transportation and admission fee for this examination for all of our contestants.''

Mr. Vandiver testified that there were one hundred sixty students in the high school, and two hundred eleven in the junior college. He stated that these activities were necessary to the physical and intellectual development of the students—that the fees were charged in order that they might be maintained. He further testified that the town of Moorhead maintains a grammar school, but that the Sunflower Agricultural High School is the only high school in that community. The complainants are local and transported pupils.

The chancellor dissolved the injunction and dismissed the bill.

The questions here involved pertain only to students in the agricultural high school. None of the complainants were students in the junior college; and nothing said in the course of this opinion refers to powers of the trustees of the junior college, or to the powers of such college. Agricultural high schools are provided for in article 16, chapter 163, Code of 1930, beginning at section 6674, through and to section 6693, inclusive. Under section 6674 each county school board is authorized and empowered to establish not more than two agricultural high schools in the county, and to determine their location, one for white and one for colored students, ''in which instruction shall be given in high school branches, theoretical and practical agriculture, domestic science, and in such other branches as the board may hereafter provide for, and made a part of the curriculum, subject to review and correction by the state board of education.''

Section 6675 provides for a tax levy to support such schools in each county; and provides for an election

by the qualified electors, for or against such tax levy; the tax being authorized, it empowers the board of supervisors to levy the tax upon all taxable property of the county. The fund derived from this levy is to be deposited in a county depository to be paid out on an order of the board of trustees.

Section 6676 provides for the appointment of trustees, three to be elected by the board of supervisors, two by the county school board, the superintendent of education of the county serving as the sixth member. The regular term of office is four years. The section then provides: "The trustees shall have control of the property, elect and fix salaries of all teachers of the school, and shall have full power to do all things necessary to the successful operation of said school." It also provides that, "when a common school is taught in connection with an agricultural high school, the election of teachers for the common school department shall be made by the common school trustees in the same manner as is required of other common school trustees."

The provisions of section 6674 as to instruction of students in the agricultural high schools have been amplified in section 6680, in which section fifteen requirements are provided for, as follows:

"1. Each school shall own and operate a dairy sufficiently large to furnish milk and butter necessary for use in the dormitories.

"2. It shall also own and operate an approved poultry farm with one or more breeds of chickens the minimum of which shall be one hundred hens.

"3. There shall be in every school a model orchard with a minimum of one acre, demonstrating correct methods of planting, cultivating, pruning and propagation of orchard plants.

"4. There shall be in every school a model garden sufficiently large to furnish vegetables to the boarders. The minimum acreage for vegetables and truck crops shall be one acre for each twenty boarders.

"5. A sufficient number of pure-bred hogs shall be kept for teaching and demonstrating purposes.

"6. Plots of land shall be cultivated on the school farm demonstrating the yield per acre and the best method of cultivation of such crops as cotton, corn, sugar cane, potatoes, etc., suitable to the different sections of the state.

"7. Students shall be required to take part in the work thus outlined for the specific purposes of encouraging farm life in Mississippi and acquiring a practical knowledge of the same.

"8. Schools shall do such extension work and shall maintain such agricultural and home science laboratory equipment as may be prescribed by the state board of education.

"9. That the sciences and other subjects taught in the agricultural high school shall be connected vitally with the social and economic life of the school and county.

"10. Each school is required to have a minimum of one-eighth of an acre of ground set apart as a vegetable garden for use of the home economics department of the school.

"11. Each school is required to own and operate an incubator for the teaching of poultrying in the home economics department of the school.

"12. Each school must provide means for the laundering of plain clothes for the boarding students.

"13. Each school is required to own a modern canning outfit for the use of the school, and for demonstration work in the communities of the county.

"14. Each girl boarding in the dormitory of these schools must do five hours per week of practical work.

"15. All girls who graduate from an agricultural high school must demonstrate their ability to make their own clothes, prepare and serve meals, and do other things necessary to ordinary household management."

In addition to the authority to levy taxes in section 6675, the board of supervisors, in section 6681, are au-

thorized to levy on the taxable property in the county, at the time the annual tax levy is made, a tax for building, repairing, and equipping agricultural high schools, as well as for the purchase of suitable lands or buildings, or both, or for the payment of debts heretofore created for any of said purposes, not exceeding three mills.

By section 6682, detailed statements must be made by the trustees of the agricultural high schools to the boards of supervisors, showing receipts and disbursements of the funds of such school; and the county superintendent of education must annually, on the 1st Monday in July, transmit to the state superintendent of education a copy of said detailed statement which will be embodied in his biennial report to the Legislature.

By section 6683, the board of trustees of each county shall be the judges of the eligibility of all applicants for admission to any agricultural high school in their respective counties, and shall not permit any applicant to become a student therein, when in the opinion of said trustees the moral or mental characteristics of the applicant are such as would prove detrimental to the good morals of the institution.

Under section 6684 of the Code it is the duty of the Legislature to make appropriations to meet the conditions of this article.

The state auditor, after the state board of education has approved an agricultural high school, and where it it has complied with the requirements of the statute, is authorized to draw a warrant in favor of the board of trustees on the state treasury, to be paid out of the fund appropriated for that purpose, in the sum of one thousand dollars a year, and a further sum of twenty-five thousand dollars is set aside by the statute, as an equalizing fund, to be distributed by the state board of education where the need is the greatest, which amounts shall be distributed without reference to attendance. The remainder shall be disbursed on a per capita basis, on

the attendance for the previous session, providing that no school shall receive more than five thousand five hundred dollars a year.

The language of the statute relied upon for the collection of the thirteen dollars fee involved in this suit, and the enforcement of the payment thereof by expulsion, or the refusal to permit students to attend, is contained in section 6676, quoted above: "And shall have full power to do all things necessary to the successful operation of said school."

In 56 C. J., p. 331, sec. 202, under the hearing "Powers, Functions and Duties in General," it is said: "The powers and authority of the officers and directors, trustees, or the like, of school districts and other local school organizations, like those of other public officers, are ordinarily purely statutory and derivative, and are under the control of the Legislature, which may enlarge or abridge them as it sees fit. So such officers or boards possess such powers, and such only, as have been expressly conferred upon them by statute or are necessarily implied from those so conferred or from the duties imposed upon them; and a fortiori, such an officer or board can have no authority which the state in its sovereign capacity could not delegate or confer. All persons who deal with school boards and officers are presumed to have knowledge of the extent of their powers, and the manner in which such powers may or must be exercised."

In support of the statement that such official or board possesses such power, and such only as have been expressly conferred upon them by statute, or are necessarily implied from those so conferred, the following authorities are cited: Scott v. Magazine Special School District No. 15, 173 Ark. 1077, 294 S. W. 365; A. H. Andrews Co. v. Delight Special School Dist., 95 Ark. 26, 128 S. W. 361; First Nat. Bank of Waldron v. Whisenhunt, 94 Ark. 583, 127 S. W. 968; Pasadena Sch. Dist. v. Pasadena, 166 Cal. 7, 134 Pac. 985, 47 L. R. A. (N. S.)

892, Ann. Cas. 1915B, 1039. To same effect Grigsby v. King, 202 Cal. 299, 260 Pac. 789; Stowell v. Prentiss, 323 Ill. 309, 154 N. E. 120, 50 A. L. R. 584; School Directors of Dist. No. 3 v. Fogleman, 76 Ill. 189; Peers v. Madison County Sch. Dist. No. 3 Bd. of Education, 72 Ill. 508; Sherlock v. Village of Winnetka, 68 Ill. 530; Bohn v. Stubblefield, 238 Ill. App. 453; Kuykendall v. Hughey, 224 Ill. App. 550; Harris v. Kill, 108 Ill. App. 305; Andrew v. Stuart Sav. Bank, 204 Iowa, 570, 215 N. W. 807; Bopp v. Clark, 165 Iowa, 697, 147 N. W. 172, 52 L. R. A. (N. S.) 493, Ann. Cas. 1916E, 417; Wright v. Bd. of Educ. of St. Louis, 295 Mo. 466, 246 S. W. 43, 27 A. L. R. 1061; Cons. Sch. Dist. No. 6 of Jackson County v. Shawhan (Mo. App.), 273 S. W. 182; State v. Kessler, 136 Mo. App. 236, 117 S. W. 85. See State ex rel. Roberts v. Wilson, 221 Mo. App. 9, 297 S. W. 419 (recognizing the rule); McNair v. Cascade County Sch. Dist. No. 1, 87 Mont. 423, 288 Pac. 188, 69 A. L. R. 866; State ex rel. Henderson Banking Co. v. McBridge, 31 Nev. 57, 99 Pac. 705; Union Free Sch. Dist. No. 2, Town of Brookhaven, Bd. of Education v. Graves, 214 App. Div. 40, 210 N. Y. S. 439; Gillespie v. McLean County Com. Sch. Dist. No. 8, 56 N. D. 194, 216 N. W. 564; Henderson v. Long Creek Sch. Dist. No. 2, 41 N. D. 640, 171 N. W. 825; Rhea v. Bd. of Educ. of Devil's Lake Spec. Sch. Dist., 41 N. D. 449, 171 N. W. 103; Pronovost v. Brunette, 36 N. D. 288, 162 N. W. 300; Kretchmer v. School Bd. of Dist. No. 12, Barnes County, 34 N. D. 403, 158 N. W. 993; Schwing v. McClure, 120 Ohio St. 335, 166 N. E. 230; School Dist. No. 106 of Clackamas County v. New Amsterdam Casualty Co., 132 Or. 673, 288 Pac. 196; Crawford v. Klamath County School Dist. No. 7, 68 Or. 388, 137 Pac. 217, 50 L. R. A. (N. S.) 147, Ann. Cas. 1915C, 477; Baxter v. Davis, 58 Or. 109, 112 Pac. 410, 113 Pac. 438 (cit. Cyc.); In re Student Patrols, 11 Pa. Dist. and County Rep. 660; Grabe v. Lamro Independent Cons. School Dist. No. 20, Tripp County, 53 S. D. 579, 221 N. W. 697; Dahl v. Lawrence County Independent School

Dist. No. 2, 45 S. D. 366, 187 N. W. 638; Thompson v. Elmo Independent School Dist. (Tex. Civ. App.), 269 S. W. 868; Royse Independent School Dist. v. Reinhardt (Tex. Civ. App.), 159 S. W. 1010; Seattle High School Chapter No. 200 v. Sharples, 159 Wash. 424, 293 Pac. 994, 72 A. L. R. 1215; Hansen v. Lee, 119 Wash. 691, 206 Pac. 927; Dooley v. Cabin Creek Dist. Bd. of Education, 80 W. Va. 648, 93 S. E. 766. To same effect, Coberly v. Gainer, 69 W. Va. 699, 72 S. E. 790.

We have examined many of the authorities above cited, and, generally speaking, they fully sustain the statement that the powers of school trustees are only such as are given by statute, or those which are necessarily implied from those expressly given.

Under the statutes above referred to, no power is given to the school trustees in express language to impose the charges here involved. We think it clear from a study of the statute above referred to, and it was originally the purpose, that the tuition should be free, and that the buildings and facilities should be provided for by taxation or by donation.

We do not question here the powers of the trustees to make the charges involved on condition, or as a condition of the student's using the facilities provided. We deal with the power to coerce their payment by excluding students from such schools. A distinction is to be drawn between compulsory payment of such fees and payment as a condition of using the facilities. This distinction has been made in State ex rel. Little v. Regents of University of Kansas, 55 Kan. 389, 40 Pac. 656, 29 L. R. A. 378, and New Orleans v. Board of Adm'rs of Tulane Educational Fund, 123 La. 550, 49 So. 171, and other authorities.

At page 385 of 29 L. R. A., 55 Kan. 389, 40 Pac. 656, 658, reporting State ex rel. Little v. Regents of University of Kansas, supra, the court said:

"This disposes of the objections to the form of the action. But little need be said on the merits of the case.

Section 11, chapter 258, Laws 1889, which was in force at
the time the action was brought, reads: 'Admission into
the university shall be free to all the inhabitants of
the state, but a sufficient fee shall be required from non-
resident applicants, to be fixed by the board of regents,
and no person shall be debarred on account of age, race
or sex.' Notwithstanding the apparently plain provisions
of this section, it is contended that the board of regents
may yet collect a reasonable fee for the wear and tear
of the books; that the word 'free' must be taken with
qualifications; that in the nature of things there must be
rules and regulations; that each and every student cannot
be permitted to occupy the chancellor's seat at his desk,
or any other place in the university he may choose, at
his own sweet will, but that the regents and the chancel-
lor have a right to make proper regulations; and that
the fee imposed is no more than is reasonable to preserve
and protect the library. We fully agree with so much
of the claim of the learned counsel as asserts the
right of the regents and the chancellor to make all
necessary and proper rules and regulations for the or-
derly management of the school, the preservation of
discipline therein, and the protection of its property,
but that it may require the payment of money as a con-
dition precedent to the use of the property of the state
is another and a different claim, with which we do not
agree. If the regents may collect five dollars for the use
of the library, why may they not collect also for the use
of the rooms of the building and of its furniture? Why
may they not impose fees for walking in the campus,
or for the payment of instructors? All these things have
cost money. There are expenses incurred by the state
on behalf of the students in connection with every de-
partment of the school. If they may collect for one thing,
it is not apparent why they may not collect for another.
It is suggested that supplies are furnished in the lab-
oratories for the use of students, which are destroyed,
that vessels and implements may be broken, and that

the students should certainly be required to pay for these things. No question of that kind, however, is now presented, and express provision therefor is made by chapter 226, Laws 1895. The library is provided for permanent use. Each volume with proper care may be used by a great number of students, and for a long term of years. The library as a whole is subjected to wear and tear, but only in the same manner as furniture and other properties furnished by the state. The buildings, furniture, library, and apparatus, as well as the services of the faculty, are furnished and paid for by the state. These, we hold, under the provisions of the state quoted, are free to all residents of the state who are entitled to admission into the university. The regents have no power to raise a fund to be managed and disposed of at their discretion by charging fees for the use of the library, or under any other claim for any other purpose, unless expressly authorized to do so by law."

The general language used in fixing the power of the trustees in section 6676 must be interpreted by the intent of the statutes above cited, creating the school and defining its object. The expression does not confer unlimited and unregulated discretion to do anything that the board of trustees may deem necessary; it is to be interpreted in the light of the purposes for which the school is created, and has reference to the disciplinary control and business management of schools, when the funds and facilities are supplied by law. We do not think the power broad enough to authorize the board to impose charges not specifically authorized by law, and to enforce payment by refusing permission to attend the school where students are eligible to attend. The statute providing for support of these schools by levying a tax upon the taxable property of the county, and by state aid, excludes, by implication, the power to charge other fees, or charge for attendance. The section giving trustees power, or making them judge of the eligibility of the applicants, under section 6683, is indicated in the

concluding part of the section. It does not give them unbridled discretion to reject students morally qualified and having the mental training and knowledge necessary to entrance. It may be that more students desire to enter than can be accommodated; but where the facilities are sufficient, students otherwise entitled to attend by reason of having the required foundation in educational subjects, if they be of good moral character, should be received.

In Thompson & Co. v. Lamar County A. High School, 117 Miss. 621, 78 So. 547, this court, sitting in banc, decided that the above broad language from section 6676 was held not to authorize the board of trustees to expend public funds in the payment of board for students; and not to authorize the board to contract debts against the fund provided for the school for the purpose of supplying a boarding house or boarding facilities for the students. On page 629 of 117 Miss., 78 So. 547, 548, it is said:

"A careful and painstaking study of the laws bearing on agricultural high schools convinces us that it was not the purpose of the Legislature in creating agricultural high schools that the funds set apart to such schools should be expended in boarding pupils. No such power appears in the act, and we think that none can be implied, taking the act as an entirety. The fundamental purpose of the establishment of the school is to give instruction in the high school branches and in theoretical and practical agriculture and domestic science. The powers of the trustees are enumerated as above set out, and embrace the power to control the property, to elect and fix the salaries of teachers, followed by a general clause, 'and shall have power to do all things necessary for the successful operation of the school.' The boarding of pupils is not a public purpose. It is a private affair, and while under certain conditions a dormitory may be erected whereat students could have opportunity to procure board, it was not intended that the funds of the

institution should be used in conducting a boarding house. The trustees have not been given power to contract debts nor to hypothecate the funds raised by taxation to the purpose of supporting or boarding students. The trustees had no authority to contract a debt for : groceries and supplies for boarders, and consequently could delegate none to the principal of the school.''

In this case there was a vigorous dissent by two of the judges, but notwithstanding the full court considered the views of the dissenting judges, the majority held that the trustees had no such power. That decision dealt more with the matter of utilities and conveniences than is the case in the present suit. The statute provides for the dormitories for the pupils, and the trustees were authorized to erect from public funds suitable dormitories. These were a necessity for the statutory scheme, but it was not deemed necessary for the trustees to personally conduct a dormitory and board the pupils.

In Jones v. Day, 127 Miss. 136, 89 So. 906, 18 A. L. R. 645, we held that the trustees were authorized to pass a rule or regulation requiring students in the boarding department at all times, while attending school, to wear a uniform; and for students who were not in the boarding department to wear them while in attendance at school; that it was a reasonable disciplinary regulation. It is argued here that this is authority for the regulations sought to be sustained in the instant case. We do not think the case is authority for the position so assumed. The power of the trustees to maintain proper discipline in the school, and reasonable regulations in aid thereof, is quite a different thing from excluding a pupil from school because of failure to pay a charge made for attendance, or as a condition of attendance.

In 56 C. J., p. 294, section 152, dealing with powers of the board of education, it is said: "A county board of education, or of school trustees, although a creature of the law, may exercise any powers authorized by law, it

however has in general only such powers as are expressly conferred upon it by constitutional or statutory provision or powers which are incidental to those expressly conferred. When acting within its authority its acts partake of a legislative character, and cannot be attacked collaterally."

A number of authorities are cited to sustain the text.

In discussing the powers of school superintendents, it is said in 56 C. J. 296, section 156: "A county superintendent of schools is a public officer, whose powers and duties are derived entirely from statutory provisions, and he can exercise only such powers as are specially granted, or are incidentally necessary to carry the same into effect. The performance of duties as such officer is limited to his county. So a county school superintendent cannot remove directors who are elected in part by people of another county. A county superintendent usually has the power to examine teachers and issue teachers' certificates."

We have examined the authorities cited under these various sections, and it is therein stated that such officers have only such powers as are conferred by statute, or which are necessary to the full exercise of the powers conferred, and no other powers. We are satisfied that none of the powers granted by the Legislature contemplate a charge or a fee as a condition to admission to the school, but that it was intended to be free.

The various cases cited above discuss different applications of power. Cases are cited on points here discussed, and the approval of the cases is to be understood only as to such parts of them as pertain to the matters herein discussed. We are not to be understood as approving in detail all of the applications of these principles to particular facts. But we think the authorities amply show that trustees have only such powers as are given by law, either expressly or by necessary implica-

tion. Applying these principles to the facts in the case, and in the light of our own statutes above referred to, we think the chancellor below was in error in dismissing the bill.

The judgment will be reversed and the original injunction reinstated, and the cause remanded for a decree in accordance with these views.

Reversed and remanded.

**Anderson, J.,** delivered a specially concurring opinion.

I agree with Judge Cook in his dissent that the statute authorized the school to charge the fees in question, but in my opinion the statute is violative of section 201 of the Constitution. The result of my view is that I join Judges Smith, Ethridge, and McGowen in reversing the judgment.

I reach the conclusion that that the statute violates section 201 of the Constitution by the following process of reasoning: Section 201 of the Constitution is in this language: "It shall be the duty of the Legislature to encourage by all suitable means, the promotion of intellectual, scientific, moral and agricultural improvement, by establishing a uniform system of free public schools, by taxation, or otherwise, for all children between the ages of five and twenty-one years, and, as soon as practicable, to establish schools of higher grade." This section is a rescript of section 1 of article 8 of the Constitution of 1869.

At the time of the adoption of the Constitution of 1869, and also at the time of the adoption of the Constitution of 1890, only the elementary branches of learning were taught in the common schools, approximately corresponding to the grammar and junior high grades of the common free schools of the present time. When the Constitution of 1869 was adopted, the University was the only

state supported college in Mississippi. By the Act of July 2, 1862 (12 Stat. 503), Congress had donated large tracts of land to the state for the support of agricultural and mechanical colleges. Between the time of the adoption of the Constitution of 1869 and that of 1890, the state established the Agricultural & Mechanical College at Starkville and the Alcorn Agricultural & Mechanical College at Rodney. Section 213 of the Constitution of 1890 made it the duty of the Legislature to carry out the conditions of that act of Congress. When the Constitution of 1890 was adopted, the female college at Columbus had been established. They were all colleges in the definition of that term. They were "institutions of higher learning, having but a single faculty and curriculum, leading to the degree of Bachelor of Arts." Webster's New International Dictionary. So, when section 201 of the Constitution of 1890 was adopted, the members of the convention knew that the state had established, and was supporting in whole or in part, these four colleges, and they also knew that the curriculum of the common schools of the state, as a rule, did not go beyond the junior high school grades. With this knowledge, what did the framers of the Constitution mean by the last clause of section 1, article 8, of the Constitution of 1869, and of section 201 of the Constitution of 1890, which made it the duty of the Legislature "as soon as practicable, to establish schools of higher grade?" The question is, How much "higher grade?" Did the framers of the Constitution intend to empower the Legislature to establish all the necessary schools to fill up the gap between the common schools and the colleges, or to just go part of the way, and, if only part of the way, how far?

Chrisman v. City of Brookhaven, 70 Miss. 477, 12 So. 458, is usually referred to as holding that the Legislature has power to establish schools lower in grade than the

colleges, not subject to the provisions of section 201 of the Constitution. The statute involved in that case was chapter 242, p. 376, Laws of 1890. The particular provision of the act passed on by the court was section 5, authorizing the board of mayor and aldermen of the city of Brookhaven to issue bonds in the sum of ''fifty thousand dollars, for the purpose of purchasing a site and erecting thereon suitable buildings for the use of the public schools of said city; and to purchase all necessary furniture [etc.], for said school,'' and that three thousand dollars of the amount might be used for the purchase of a site and the erection of a suitable building for a free public school for colored children. The court held that these schools were schools outside of the common free school system, and that their establishment was not violative of section 1, article 8, of the Constitution of 1869, requiring the Legislature to establish a uniform system of free public schools.

Later the case of Ellis v. Greaves, 82 Miss. 36, 34 So. 81, was decided. There was involved in that case the constitutionality of chapter 148 of the Laws of 1888. Leaving out the first four sections of chapter 242 of the Laws of 1890, which were not involved in the decision of the Chrisman case, the other provisions of the statute that were involved are substantially the same as those provisions of chapter 148 of the Laws of 1888, considered and passed on in Ellis v. Greaves. In fact, sections 5, 6, 8, 9, and 11 of the act of 1890 are very largely in the identical language of sections 1, 2, 3, 4, and 6 of the act of 1888.

The general purpose of the act of 1890 was to establish and maintain free public schools for the white and colored races in the city of Brookhaven. Likewise it was the purpose of the act of 1888 to establish free public schools for the city of Hazlehurst. In the Brookhaven case the court held that the schools sought to be estab-

lished were outside of the common school system, and therefore the statute was not violative of section 1, article 8, of the Constitution of 1869. While in the Hazlehurst case the court held exactly to the contrary—that the schools were part of the common free school system, and that that provision of the statute designating certain persons as trustees of the schools for a term of twenty years and granting them power to fill vacancies violated section 201 of the Constitution of 1890. Section 11, chapter 242 of the Laws of 1890, is an exact copy of section 6, chapter 149, Laws of 1888, except as to the names of the trustees designated and the date fixed for the first meeting of the trustees. It appears to me, therefore, that whatever value the Brookhaven case might have had as a precedent in the case at bar was destroyed by the Hazlehurst case.

In Otken v. Lamkin, 56 Miss. 758, 759, the court held that schools of a higher grade than the common schools came within the meaning of the last clause of section 1, article 8, of the Constitution of 1869 (which is the same as the last clause of section 201 of the present Constitution), and when established were part of the common free school system.

In McLeod v. State ex rel. Colmer, 154 Miss. 468, 122 So. 737, 63 A. L. R. 1161, the court held that our system of high schools came within the definition of "schools of a higher grade" in the meaning of the last clause of section 201 of the Constitution.

None of the grades of the common free schools are taught in the high schools. If high schools are part of the common free school system, why not agricultural high schools and junior colleges? Where is the line of demarcation between the common free schools and the colleges? My answer to the question is that, under section 201 of the Constitution, there can be no other schools established independent of and occupying a place

between the common free school system and the colleges. If junior colleges and agricultural high schools are not covered by section 201 of the Constitution, and therefore not a part of the common free school system, it appears to me that the Legislature can go on establishing such schools to the extent of absolutely destroying the common free school system.

My conclusion is that, under our system of public education in this state, there are only two classes of schools provided for, the colleges and the common free schools. Section 201 of the Constitution makes provision for the latter. The colleges are provided for alone by statute, except the provision made by section 213 for the Agricultural & Mechanical College and the Alcorn Agricultural & Mechanical College. All schools of a lower grade than colleges are provided for by section 201; they are a part of the common free school system.

All the members of the court agree, as I understand, that, if the Sunflower County Agricultural High School is a part of the common free school system, then, under section 208 of the Constitution, tuition fees could not be charged.

**Cook, J.,** delivered a dissenting opinion.

I am unable to agree with the main opinion in this case, and I am not in accord with the view expressed in the specially concurring opinion of Judge ANDERSON that section 6676, Code of 1930, prescribing the powers and duties of boards of trustees of agricultural high schools, violates section 201 of the Constitution of 1890, requiring "the Legislature to encourage by all suitable means, the promotion of intellectual, scientific, moral and agricultural improvement, by establishing a uniform system of free public schools, by taxation, or otherwise, for all children between the ages of five and twenty-one

years, and, as soon as practicable, to establish schools of higher grade.''

It seems clear to me that agricultural high schools established under article 16, chapter 163, Code of 1930, are not a part of the common free school system. Aside from the fact that agricultural high schools may teach the same subjects as are taught in the free schools of the state, there is little of similarity between such schools, either in the manner of establishment, organization, control, or support, or in the primary purposes sought to be accomplished. Section 201 of the Constitution requires the Legislature to establish a uniform system of free public schools for all children between the ages of five and twenty-one years, and enjoins upon it the duty to establish, as soon as practicable, schools of higher grade, that is, in my opinion, schools of a higher grade as a part of the uniform free public school system. In Otken v. Lamkin, 56 Miss. 758, it was held that the ''schools of higher grade'' provided for by section 1 of article 8 of the state Constitution (now section 201 of the Constitution of 1890) were embraced in the general scheme of that article as well as the ''free public schools'' provided for therein, and that they were, when established, equally entitled to share in the common school fund created by said article. But neither this requirement of the Constitution, nor compliance therewith, prohibits the Legislature from establishing or supporting other schools outside of the common school system which, as an incident to the main purpose of such schools, teach those subjects or branches of learning which are taught in the uniform system, and this court so held in the case of Chrisman v. Brookhaven, 70 Miss. 477, 12 So. 458, 459, wherein the court said: ''It [the Constitution] enjoins upon the Legislature to establish and maintain a uniform system of free public schools, but does not prohibit the establishment of other schools

outside of its system, and the Legislature may provide for schools at pleasure not invading the constitutional scheme.'' See, also, State Teachers' College v. Morris (Miss.), 144 So. 374, 376.

It is said, however, in the specially concurring opinion herein that the Chrisman Case is in conflict with the case of Ellis v. Greaves, 82 Miss. 36, 34 So. 81, 82, and is therefore of no value as a precedent. Upon the particular point here being considered I rest upon the announcement of the court itself in the Ellis v. Greaves Case that: ''Nor does the case of Chrisman v. City of Brookhaven, 70 Miss. 477, 12 So. 458, in any way conflict with our view. The only thing held by that case is simply 'that, while the Legislature may not authorize a diversion of the common-school fund, it may empower local authorities to provide schools outside the established system, and to pay therefor by taxation.' '' This is a clear reannouncement of the principle that section 201 of the Constitution is not a limitation on the power of the Legislature to authorize the establishment of schools outside of the established free public school system, and to pay therefor by taxation.

The next question that arises then is, Are agricultural high schools established, organized, and conducted under the provisions of article 16, chapter 163, Code of 1930 (sections 6674 to 6693, inclusive), a part of the common or free public school system required by section 201 of the Constitution?

Many of the pertinent provisions of these sections authorizing the establishment, and providing for the government, control, and operation of agricultural high schools are in substance set forth in the main opinion, and they will not be repeated here further than to call attention in a general way to the points of dissimilarity between such schools and the free public schools which, to my mind, demonstrate that they are not and cannot be a part of the latter class of schools.

In compliance with the constitutional mandate, the Legislature has provided a uniform system of public schools throughout the state. For the establishment and for conducting these schools it has provided for the creation of school districts of five, and only five, kinds or classes, that is—common school districts, which are ordinary rural schools organized by the county school board; consolidated districts with one school in each district; special consolidated districts with more than one school in each district; municipal separate districts; and rural separate districts, to all of which schools, except the common rural school, may be added as a part thereof, by the governing authorities, high school grades, or courses. For the government and control of each of these various classes of free public schools it has provided for the election of trustees and prescribed in detail their powers and duties. It has provided for the support thereof out of a common school fund, created and distributed in accordance with section 206 of the Constitution of 1890, and it was held in Otken v. Lamkin, and State Teachers' College v. Morris, supra, that the school fund provided by this section of the Constitution can only be applied to such schools as come within the uniform system and are under the supervision and control of the public officers charged with the duty of establishing and supervising that system of schools.

The main purpose of agricultural high schools as set forth in section 6680, Code of 1930, is "to teach theoretical and practical agriculture and home economics, and to be of real service to the farmers of the county." The features that distinguish this class of schools from those established as free public schools are many and important. The trustees of a common free school of a county in which an agricultural high school is located have nothing to do with the management or control of such school, except to elect teachers for the common school depart-

ment where a common school is taught in connection therewith. The government, control, and management of agricultural high schools are vested in a separate board of trustees of six members. Upon this board there is conferred the general power to control the property, elect and fix salaries of all teachers of the school, and full power to do all things necessary to the successful operation of the school. Each agricultural high school is required to own and operate a dairy, an approved poultry farm of not less than one hundred hens, a model garden for vegetables and truck crops of one acre for each twenty boarders. It is required that each school shall own and keep a number of pure bred hogs sufficient for teaching and demonstration purposes; shall own and cultivate a school farm demonstrating the yield per acre and the best method of cultivation of such crops as are suitable to the particular locality of the school, and shall compel its students to take part in all its work for the specific purposes of encouraging farm life in this state and acquiring a practical knowledge of the same. It is required that such schools shall do such extension work and maintain such agricultural and home science laboratory equipment as may be prescribed by the state board of education; that the sciences and other subjects taught in such schools shall be connected vitally with the social and economic life of the school and county. Each school is required to own and operate an incubator for the teaching of poultrying, and also a modern canning outfit for the use of the school and for demonstration work in the various communities of the county. As a prerequisite to the graduation of girls from such schools a demonstration of ability as seamstresses, and in all things necessary to ordinary household management, is required. Certainly it was never within the contemplation of the Constitution makers that schools required to engage in all these activities, and

which were organized for a limited primary purpose, should become a part of the uniform system of public schools which all the children of the state between the ages of five and twenty-one years are entitled and required to attend.

If agricultural high schools were a part of the uniform system of free public schools, they would be entitled to support out of the general common school fund provided in compliance with section 206 of the Constitution, but so far as I am advised it has never been contended or contemplated by any one that such schools were, or are, entitled to share in this fund. An entirely different method has been provided for the support of such schools, that is, by a levy of taxes on the property of the county or counties establishing such schools, supplemented by funds appropriated by the Legislature for that special purpose out of the general state funds. All funds provided for the establishment, support, and maintenance of these agricultural high schools are entirely separate and distinct from the common school fund, and that such is the case, we have a direct legislative expression in the requirements of sections 6687 and 6688, Code of 1930, that when an agricultural high school is abolished or abandoned, the board of supervisors shall dispose of all the property of such school, and, after paying all outstanding obligations, pay the balance into the common school fund of the county or counties owning the school.

Another marked feature of differentiation between schools of the uniform free school system and agricultural high schools is that all children of the state between the ages of five and twenty-one years are entitled, and indeed required, to attend the schools of the uniform system, while there is no age limit fixed for students in agricultural high schools, and young men and women over the age of twenty-one years may, and in fact do,

attend these schools and avail themselves of all the privileges thereof, none of which are required by law to be furnished free.

While there are others, I think I have sufficiently noted the points of difference between these classes of schools, and, if the announcement of the court in State Teachers' College v. Morris, supra, that "in order for a school to be within the system of free public schools required by section 201 of the Constitution, the establishment and control thereof must be vested in the public officials charged with the duty of establishing and supervising that system of schools," is kept in view, I think it is manifest that agricultural high schools are not a part of the uniform free public school system, and that consequently the power of the Legislature to provide for their control and management, and for charging tuition and fees therein, is not controlled by section 201 of the Constitution. If section 6676, Code of 1930, providing for the appointment of trustees of agricultural high schools, and prescribing their powers and duties, violates section 201 of the Constitution, then, in my judgment, it follows as a necessary sequence that the entire legislative plan for the organization and government of these schools must be held to be violative of this constitutional provision and must be stricken down.

I do not understand that the main opinion challenges the constitutionality of section 6676, Code of 1930, or the power of the Legislature to charge, or authorize the charging of the fees in question, but it proceeds upon the theory that the Legislature has not authorized the trustees to charge such fees and make the payment thereof a condition precedent to entrance or continuance as a student in the school. The main opinion contains a lengthy argument and the citation of a great many authorities to establish a principle that, so far as I am advised, is not controverted by any one, that is—that

trustees of school districts and other local school organizations possess such powers, and such only, as have been expressly conferred on them by statute, or are necessarily implied from those so conferred, or from the duties imposed upon them. I readily concede that such principle is one of universal application.

If there are no constitutional limitations upon the power of the Legislature to establish and provide for the government and operation of schools of the class here involved, which are designed for the accomplishment of a particular and special purpose named in the statute authorizing the establishment thereof, then its power to prescribe, either directly or through duly constituted subordinate boards or agencies, a curriculum, and extra curricula activities, mandatory or elective, and to charge tuition or fees for all, or any part of the prescribed course of study or such special activities as are deemed necessary to the successful operation of that school, is limited only by the test of reasonableness. There is no duty enjoined upon the Legislature to furnish without cost the facilities offered by agricultural high schools, or the special training to be obtained therein. These schools were established for a special purpose and to afford an opportunity for special training to all who desired to avail themselves thereof, and who were willing to abide by the prescribed regulations, and pay such tuition and fees as are required for the mandatory courses of study and special activities, incident to and in aid of such courses of study, and in aid of the more complete and perfect accomplishment of the primary purpose of such schools. Entrance into these institutions of learning and special training is not an absolute right, but a privilege to be obtained by compliance with all reasonable requirements or regulations for such entrance, and the fact that certain facilities, or courses of study, are furnished without cost to the stu-

dent does not entitle him to demand that all be free, or
that he be relieved from any required course, or from
these extracurricula activities.

By section 6676, Code of 1930, the government and
control of agricultural high schools is vested in a board
of trustees of six members, and these trustees are granted
full power to do all things necessary to the successful
operation of the school. For the general purpose of the
successful operation of the school, the power granted
to the trustees is unlimited. The Legislature has not
deemed it necessary to specify in detail the power and
duties of the board of trustees, but has covered the en-
tire subject by the general and broad grant of "full
power" to do "all things" necessary for the successful
operation of the school. Power could not be conferred
in broader or more comprehensive terms.

It is said in the main opinion that this grant of "full
power" must be interpreted in the light of the purposes
for which the school is created, and that the power con-
ferred must be limited to disciplinary control and busi-
ness management of such schools. I am unable to fol-
low any line of reasoning so limiting the plain language
of the statute. It is true that the grant of "full power"
to do all things necessary for the successful operation
of these schools must be interpreted in the light of the
purposes for which they are created, but there are things
necessary for the successful operation of schools of this
character other than disciplinary control and business
management. In any event, a regulation fixing tuition
and fees and requiring the payment thereof by those who
avail themselves of the facilities and advantages fur-
nished may properly be classified under the head of
business management of the school. That the Legisla-
ture itself had the power to impose and require the
payment of these charges or fees, if it deemed them nec-
essary for the successful operation of such schools, would

hardly be controverted. Whatever power the Legislature has in that regard has been conferred upon the trustees by the grant of "full power" to do "all things," and in the lawful exercise of their judgment and discretion in determining what "is necessary to the successful operation of the school" the courts have no right to interfere on the ground that their action is characterized by lack of wisdom or sound discretion. An exercise of honest judgment, although erroneous, is not an abuse of the discretion committed to the trustees of these schools by the Legislature, and consequently their act in determining that these fees are necessary to the successful operation of the school is not subject to review by the courts, unless they have acted arbitrarily or unreasonably. Whenever the power and discretion vested in the trustees have been arbitrarily and unreasonably exercised, the courts may and will interfere upon proper application, but the main opinion is not based upon the ground that the requirement of fees for these extracurricula activities was an arbitrary and unreasonable exercise of the power granted.

The main opinion quotes liberally from, and relies strongly on, the case of State v. Regents of University, 35 Kan. 389, 40 Pac. 656, 658, 29 L. R. A. 378, but I think that case is clearly distinguished from the case at bar by the statement appearing in the quoted paragraph of the opinion that "section 11, chapter 258, Laws 1889, which was in force at the time the action was brought, reads: 'Admission into the university shall be free to all the inhabitants of the state.'" There is no constitutional or statutory requirement that admission into agricultural high schools shall be free to all inhabitants of this state.

In the case of Jones v. Day, 127 Miss. 136, 89 So. 809, 18 A. L. R. 645, this court held that a regulation that all male students of an agricultural high school should wear

khaki uniforms while attending the school was a reasonable regulation and a proper exercise of the power to do all things necessary to the successful operation of the school. It is said that this case is no authority for the regulations sought to be sustained in the case at bar, for the reason that the requirement that uniforms be worn at all times while in attendance at the school was in aid of discipline. It may be true that the requirement of uniforms may be partially justified on disciplinary grounds, but there are other well recognized and important considerations that enter into the determination of the reasonableness of a regulation requiring the wearing of uniforms, and, while I concede that Jones v. Day, supra, is not necessarily controlling here, I think it has strong persuasive force in aid of my views. I think the rule or regulation requiring the payment of the fees in question is a reasonable exercise by the trustees of a power expressly granted by statute.

I am authorized by Judge GRIFFITH to say that he concurs in this dissent.